No. 92,032

RYAN MONTOY, *et al., Appellees/Cross-appellants,* ·v. STATE OF KANSAS, *et al., Appellants/Cross-appellees.*

112 P.3d 923

Supplemental opinion filed June 3, 2005.

*Kenneth L. Weltz,* of Lathrop & Gage L.C., of Overland Park, argued the cause, and *Curtis L. Tideman, Alok Ahuja,* and *Jeffrey R. King,* of the same firm, and *David W. Davies,* assistant attorney general, and *Phill Kline,* attorney general, were with him on the briefs for appellant/cross-appellee State of Kansas.

*Dan Biles,* of Gates, Biles, Shields & Ryan, P.A., of Overland Park, argued the cause, and *Rodney J. Bieker,* of Kansas Department of Education, and *Cheryl Lynn Whelan,* of Lawrence, were with him on the briefs for appellants/cross-appellees Janet Waugh, Sue Gamble, John Bacon, Bill Wagnon, Connie Morris, Kathy Martin, Kenneth Willard, Carol Rupe, Iris Van Meter, Steve Abrams, and Andy Tompkins.

*Alan L. Rupe,* of Kutak Rock LLP, of Wichita, argued the cause, and *Richard A. Olmstead,* of the same firm, and *John S. Robb,* of Somers Robb & Robb, of Newton, were with him on the briefs for appellees/cross-appellants.

*Wm. Scott Hesse,* assistant attorney general, was on the brief for defendants/ cross-appellees Governor Kathleen Sebelius and State Treasurer Lynn Jenkins.

*Jane L. Williams,* of Seigfreid, Bingham, Levy, Selzer & Gee, of Kansas City, Missouri, was on the briefs for *amicus curiae* Kansas Families United for Public Education.

*Patricia E. Baker* and *Zachary J.C. Anshutz,* of Kansas Association of School Boards, of Topeka, were on the briefs for *amicus curiae* Kansas Association of School Boards.

*David M. Schauner* and *Robert M. Blaufuss,* of Kansas National Education Association, of Topeka, were on the briefs for *amicus curiae* Kansas National Education Association.

*Joseph W. Zima,* of Topeka Public Schools, was on the brief for *amicus curiae* Unified School District No. 501, Shawnee County, Kansas.

*Michael G. Norris* and *Melissa D. Hillman*, of Norris, Keplinger & Hillman, L.L.C., of Overland Park, were on the brief for *amici curiae* Unified School Districts Nos. 233, 229, and 232, Johnson County, Kansas.

*Anne M. Kindling*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, was on the briefs for *amicus curiae* Unified School District No. 512, Shawnee Mission, Kansas.

*Bernard T. Giefer*, of Giefer Law LLC, of WaKeeney, was on the briefs for *amici curiae* Unified School District No. 208, Trego County, Kansas (WaKeeney), *et al.* (60 other Kansas school districts).

*Thomas R. Powell* and *Roger M. Theis*, of Hinkle Elkouri Law Firm L.L.C., of Wichita, were on the briefs for *amicus curiae* Unified School District No. 259, Sedgwick County, Kansas.

*Janice L. Mathis*, of Rainbow/PUSH Coalition, of Atlanta, Georgia, was on the brief for *amicus curiae* Rainbow/PUSH Coalition.

*Cynthia J. Sheppeard*, of Weathers & Riley, of Topeka, was on the briefs for *amicus curiae* Kansas Action for Children.

*Bob L. Corkins*, of Lawrence, was on the brief for *amicus curiae* Kansas Taxpayers Network.

*Kirk W. Lowry*, of Kansas Advocacy & Protective Services, of Topeka, was on the brief for *amicus curiae* Kansas Advocacy & Protective Services.

*Martha B. Crow*, of Crow, Clothier & Associates, of Leavenworth, was on the brief for *amicus curiae* Martha B. Crow.

*Dr. Walt Chappell*, of Wichita, was on the brief for *amicus curiae* Educational Management Consultants.

*Tristan L. Duncan* and *Daniel D. Crabtree*, of Stinson Morrison Hecker L.L.P., of Overland Park, were on the brief for *amici curiae* Individual Students in the Shawnee Mission Unified School District No. 512.

*Per Curiam*: This case requires us to review recent school finance legislation to determine whether it complies with our January 3, 2005, opinion and brings the state's school financing formula into compliance with Article 6, § 6 of the Kansas Constitution. We hold that it does not.

## FACTS

In our January opinion, this court reversed the district court in part and affirmed in part, agreeing that the legislature had failed to make suitable provision for finance of the public school system

and, thus, had failed to meet the burden imposed by Article 6, § 6 of the Kansas Constitution. *Montoy v. State,* 278 Kan. 769, 102 P.3d 1160 (2005) *(Montoy II).* Among other things, we held that the Kansas School District Finance and Quality Performance Act (SDFQPA), K.S.A. 72-6405 *et seq.,* as funded, failed to provide suitable finance for students in middle-sized and large districts with a high proportion of minority and/or at-risk and special education students; some school districts were being forced to use local option budgets (LOB) to finance a constitutionally adequate education, *i.e,* suitable education; the SDFQPA was not based upon actual costs, but rather on former spending levels and political compromise; and the failure to perform any cost analysis distorted the low-enrollment, special education, vocational education, bilingual, and at-risk student weighting factors.

We further held that among the critical factors for the legislature to consider in achieving a suitable formula for financing education were "equity with which the funds are distributed and the actual costs of education, including appropriate levels of administrative costs." We provided this guidance because "the present financing formula increases disparities in funding, not based on a cost analysis, but rather on political and other factors not relevant to education." We also held that "increased funding will be required." *Montoy II,* 278 Kan. at 775.

We stayed the issuance of the mandate to allow the legislature a reasonable time to correct the constitutional infirmity in the then existing financing formula. Rather than suspend the funding of education, we ordered that the present financing formula and funding would remain in effect until the court took further action, noting: "The legislature, by its action or lack thereof in the 2005 session, will dictate what form our final remedy, if necessary, will take." We set a deadline of April 12, 2005. *Montoy II,* 278 Kan. at 776.

The legislature timely responded by enacting 2005 House Bill 2247 on March 30, 2005, which was modified by 2005 Senate Bill 43, passed during the veto session (collectively H.B. 2247). The Governor allowed the bill to become law without her signature, and the new legislation was delivered to this court.

On April 15, 2005, we issued an order which, among other things, directed the parties to file briefs addressing "whether the financing formula, as amended by H.B. 2247, meets the legislature's constitutional burden to 'make suitable provision for finance' of the public schools."

The parties were first directed to address 10 specific components of the financing formula. With respect to each of the components, as well as to the formula as a whole, the parties were asked to address our special concern as to whether the actual costs of providing a suitable education was considered and whether H.B. 2247 exacerbates and/or creates funding disparities among the districts.

Second, the parties were asked to address whether additional fact-finding would be necessary, and, if so, how that fact-finding should be pursued.

Third, the parties were asked to address what remedial action should be ordered and on what timetable in the event the court concludes, without additional fact-finding, that the financing formula, as amended by H.B. 2247, is still unconstitutional.

The parties were ordered to appear before this court on May 11, 2005, to show cause why the court should or should not find that H.B. 2247 complied with our January opinion. We recognized that the burden of proof had been on the plaintiffs to show that the SDFQPA, as it existed at the time of the filing of the action herein, was constitutionally infirm. We held that because the plaintiffs had prevailed, the burden of proof had "shifted to the defendants to show that the legislature's action has resulted in suitable provision for the financing of education as required by Article 6, § 6."

Pursuant to our April order, the defendants, State of Kansas (State) and the Board of Education members and Commissioner of Education (Board), filed separate briefs. The plaintiffs filed a response brief. Ten *amici curiae* briefs were filed. Oral arguments were heard by this court on May 11, 2005.

We must now decide if H.B. 2247 remedies the SDFQPA infirmities identified in our January opinion and thus makes suitable provision for financing of education as mandated by Article 6, § 6

of the Kansas Constitution. To do that, we first need to identify the changes H.B. 2247 makes in the SDFQPA.

H.B. 2247 modifies the school finance system in several ways. First, it alters the Base State Aid Per Pupil (BSAPP) and several of the weightings and other factors that affect the formula. It increases bilingual and at-risk weightings; it eliminates correlation weighting; it provides for phased-in increases in funding of special education excess costs at a statutorily prescribed level; and it provides for increases in general state aid based on the Consumer Price Index-Urban (CPI-U). It does not substantively change the low-enrollment weighting provision as it existed at the time of the January opinion.

Second, it provides certain districts the authority to raise additional revenue through local ad valorem taxes upon taxable tangible property within the district. Specifically, it provides a phased-in increase in the LOB cap. Before H.B. 2247 was enacted, a school district could enact a LOB that was as much as 25 percent of its state financial aid. K.S.A. 72-6433(a)(1)(A)-(D); K.S.A. 72-6444. H.B. 2247 makes incremental increases in this cap of 27 percent in the 2005-06 school year, 29 percent in 2006-07, and 30 percent in 2007-08. H.B. 2247 also authorizes districts with high housing costs to levy additional ad valorem taxes upon the taxable tangible property within the district. The rationale for this provision is to allow districts to pay enhanced teacher salaries. In addition, districts with extraordinary declining enrollment may apply to the Board of Tax Appeals (BOTA) for permission to levy an ad valorem tax on the taxable tangible property of the district in an amount authorized by BOTA.

Third, H.B. 2247 makes several nonformula changes. It provides for statutorily mandated areas of instruction; establishes an 11-member "2010 Commission" to provide legislative oversight of the school finance system; and provides for a study by the Legislative Division of Post Audit to "determine the costs of delivering the kindergarten and grades one through 12 curriculum, related services and other programs mandated by state statute in accredited schools."

Fourth, H.B. 2247 limits all new local capital outlay mill levies to eight mills. SDFQPA originally capped the capital outlay level at four mills, but the cap was completely removed in 1999.

Fifth, certain changes to H.B. 2247 made by S.B. 43 are slated to become effective July 1, 2005, while other provisions became law upon publication in the Kansas Register. See S.B. 43, secs. 27, 28.

The estimated grand total for H.B. 2247's fiscal impact is approximately $142[1] million in additional state funding for the 2005-06 school year.

## DISCUSSION AND ANALYSIS

Overall, the State claims that the constitutionality of the school financing formula as amended by H.B. 2247 is not properly before this court. In its view, this case can address only the *former* financing formula, which no longer exists. Regarding the important issue of consideration of actual costs, the State contends that the legislature did consider such costs to the extent possible. At oral arguments, the State repeatedly claimed that our focus should be limited to whether the legislature had authority to pass school finance legislation, suggesting any further intervention by this court would offend the separation of powers doctrine and the carefully calibrated system of checks and balances among our three branches of government.

In the alternative, the State generally argues that if the financing formula's constitutionality remains at issue, H.B. 2247 should enjoy a presumption of constitutionality and the burden of proof should be upon the plaintiffs to demonstrate otherwise. Moreover, if the court should determine that further fact-finding is necessary on the constitutional issue, the case should be remanded for further proceedings, with the present legislation remaining in effect until

---

[1] This total increase of $142 million includes a $7.35 million increase provided by 2005 H.B. 2059, which created a second enrollment count date for students who are dependents of active military personnel. The parties do not take issue with the provisions of H.B. 2059. Our discussion of the funding and provisions in H.B. 2247 collectively refers to H.B. 2247, S.B. 43, and H.B. 2059.

the remand produces another district court ruling. Finally, as another alternative, the State argues that if this court holds the legislation unconstitutional, without remand, then our only authority is to strike it in toto. In that event, the State contends, the legislature would have to enact new legislation, because this court has no authority to impose an interim funding plan.

In contrast, the Board argues that the issue before us is whether the State complied with our January opinion. It generally disagrees that the legislation fully meets the legislature's constitutional obligation. It also argues that H.B. 2247's modifications to the financing formula were not based upon the actual costs of providing a suitable education. However, because the legislation commissions a cost study, the Board asserts this court should uphold the legislation as an adequate interim first step in a multi-year remedial response. It urges us to hold that the changes made by H.B. 2247 are sufficient pending the results of the cost study, *i.e.*, an installment on the first remedy year toward what may very well be a much larger obligation based on the evidence in this case.

The Board strongly disagrees, however, with the legislation's provisions allowing increased funding authority based solely on local ad valorem property taxes, because it believes these provisions exacerbate funding inequities based on district wealth. It asks that these provisions be stricken, with the remainder of H.B. 2247 taking effect to enable school districts to plan for the rapidly approaching school year with the benefit of increased state aid. The Board also specifically disagrees with the parameters of the legislature's proposed cost study and expresses concerns that merely studying how much money has been spent over the years on a broken school financing system will be of little assistance. As a result, it argues that additional fact-finding will be necessary to determine the future costs of providing a suitable education.

The plaintiffs argue the increases in funding "fall grossly short of what is actually necessary to provide a constitutionally suitable education." They agree with the Board that actual costs were not considered and allege that the legislation was the result of political compromise and what the majority of the legislature believed it could provide without raising taxes. They also agree with the Board

that the three provisions dependent on local ad valorem property taxes compound the formula's unjustified funding disparities.

The plaintiffs further argue that additional fact-finding is unnecessary. They ask us to (1) declare the legislation unconstitutional; (2) direct the Board to design a temporary school funding plan that incorporates recommendations from the 2001 Augenblick & Myers Study (A&M study), and direct the State to implement the plan, on a temporary basis, by July 1, 2005; (3) direct the State to enact constitutional legislation for funding public education; and (4) retain jurisdiction to ensure our orders are followed.

With this overview of the parties' arguments in mind, we turn to consideration of more specific contentions.

In support of its argument that the financing formula, as amended by H.B. 2247, is no longer properly before us, the State relies on *Knowles v. State Board of Education*, 219 Kan. 271, 547 P.2d 699 (1976). It characterizes *Knowles* as "indistinguishable" from the situation before us. In fact, the State's reliance on *Knowles* is misplaced because *Knowles* was before this court in an entirely different procedural posture.

In *Knowles*, the district court struck down the 1973 School District Equalization Act as unconstitutional. Because the legislature was in session when the judgment was entered, the district court withheld issuing a remedy in order to give the legislature time to correct "the inequities." The legislature amended the 1973 School District Equalization Act effective July 1, 1975. The district court took judicial notice of the new bill, declined to hear new evidence, dissolved the injunction, and dismissed the case. The district court held that because the legislature enacted new legislation, the law as it existed on the date of the decision no longer was in effect. Thus any determination concerning the constitutionality of the old law was moot, and any issue of the constitutionality of the new legislation was an entirely new matter that must be litigated in a new action. *Knowles*, 219 Kan. at 274.

The *Knowles* plaintiffs appealed the order dissolving the injunction and dismissing the case. This court found the new legislation had not rendered the case moot and reversed and remanded the matter to the district court for additional fact-finding on the

changes made to the formula. This court rejected the plaintiffs' request that it rule on the constitutionality of the new legislation, stating that the facts and figures necessary to demonstrate plaintiffs' claims as to the new legislation were not part of the record before the court. *Knowles*, 219 Kan. at 278.

In *Knowles*, this court did not review the 1973 Act in the first instance; nor did it reach an independent conclusion as to the constitutionality of that Act. In contrast, in the instant case, not only was the issue of the constitutionality of the SDFQPA before this court pursuant to our appellate jurisdiction, but also we evaluated the district court's findings of fact to determine if they were supported by substantial competent evidence and determined the school financing formula was unconstitutional. In addition, the statutory amendments at issue in *Knowles* were made in response to the district court's declaratory judgment issued while it still had jurisdiction over the case. Here, H.B. 2247 arose as a remedy in response to a specific order of this court while we retained jurisdiction. Due to these differences, the following statement in *Knowles* actually supports our continuing review at this juncture:

"The right of persons to challenge the constitutional effect of a law upon their persons or property should not be aborted every time the law is amended by the legislature. In some instances amendments occur almost annually with minimal impact upon the overall effect of the law. It is entirely possible that the 1976 legislature will again amend this Act.

. . . .

"The nature of this controversy is such that the rights of the parties continue to be affected by the law. It is an ongoing controversy which can be adjudicated in the present action as well, if not better, than in a new action filed." *Knowles*, 219 Kan. at 279-80.

In short, this court's retained jurisdiction allows a review to determine if there has been compliance with our opinion.

The State's next argument — that if the provisions of H.B. 2247 are properly before us, we must presume that the new statute is constitutional — has already been rejected. (Order, 4/15/05.) While this presumption normally applies to initial review of statutes, in this case we have already determined the financing formula does not comply with Article 6, § 6. H.B. 2247 was passed because

this court ordered remedial action. The State now presents its remedy for our determination of whether it complies with our order.

The Ohio Supreme Court faced the same argument after the Ohio Legislature passed school finance legislation in response to the court's ruling that the system was unconstitutional. It also rejected the argument, stating:

"The legislature has the power to draft legislation, and the court has the power to determine whether that legislation complies with the Constitution. *However, while it is for the General Assembly to legislate a remedy, courts do possess the authority to enforce their orders, since the power to declare a particular law or enactment unconstitutional must include the power to require a revision of that enactment, to ensure that it is then constitutional.* If it did not, then the power to find a particular Act unconstitutional would be a nullity. As a result there would be no enforceable remedy. A remedy that is never enforced is truly not a remedy." (Emphasis added.) *DeRolph v. State*, 89 Ohio St. 3d 1, 12, 728 N.E.2d 993 (2000).

Typically a party asserting compliance with a court decision ordering remedial action bears the burden of establishing that compliance, and our April 15 order made the allocation of that burden clear in this case. See also *DeRolph v. State*, 83 Ohio St. 3d 1212, 1212, 699 N.E.2d 518 (1998) (state must meet burden by preponderance of evidence standard).

We also reject the State's related argument that the doctrine of separation of powers limits our review to the issue of whether the legislature had the authority to pass such legislation. Any language in *U.S.D. No. 229 v. State*, 256 Kan. 232, 236-38, 885 P.2d 1170 (1994), to this effect is inapplicable here because of this case's remedial posture. Even now, however, we do not quarrel with the legislature's authority. We simply recognize that the final decision as to the constitutionality of legislation rests exclusively with the courts. Although the balance of power may be delicate, ever since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803), it has been settled that the judiciary's sworn duty includes judicial review of legislation for constitutional infirmity. We are not at liberty to abdicate our own constitutional duty.

Again, like arguments have been raised in other state courts. Other state courts consistently reaffirm their authority, indeed their duty, to engage in judicial review and, when necessary, com-

pel the legislative and executive branches to conform their actions to that which the constitution requires.

For example, in *Lake View Sch. Dist. No. 25 v. Huckabee*, 351 Ark. 31, 54-55, 91 S.W.3d 472 (2002), the court reviewed legislation passed after its 1994 determination that the Arkansas school financing system violated the education provisions of that state's constitution. The Arkansas Supreme Court stated:

"This court's refusal to review school funding under our state constitution would be a complete abrogation of our judicial responsibility and would work a severe disservice to the people of this state. We refuse to close our eyes or turn a deaf ear to claims of a dereliction of duty in the field of education. As Justice Hugo Black once sagely advised: *'[T]he judiciary was made independent because it has . . . the primary responsibility and duty of giving force and effect to constitutional liberties and limitations upon the executive and legislative branches.'* Hugo L. Black, *The Bill of Rights*, 35 N.Y.U.L. Rev. 865, 870 (1960).

. . . .

"The Supreme Court of Kentucky has emphasized the need for judicial review in school-funding matters. The language of that court summarizes our position on the matter, both eloquently and forcefully, and, we adopt it:

'Before proceeding . . . to a definition of "efficient" we must address a point made by the appellants with respect to our authority to enter this fray and to "stick our judicial noses" into what is argued to be strictly the General Assembly's business.

'. . . [In this case] we are asked—based solely on the evidence in the record before us—if the present system of common schools in Kentucky is "efficient" in the constitutional sense. *It is our sworn duty to decide such questions when they are before us by applying the constitution. The duty of the judiciary in Kentucky was so determined when the citizens of Kentucky enacted the social compact called the constitution and in it provided for the existence of a third equal branch of government, the judiciary.*

'. . . *To avoid deciding the case because of "legislative discretion," "legislative function," etc., would be a denigration of our own constitutional duty. To allow the General Assembly (or, in point of fact, the Executive) to decide whether its actions are constitutional is literally unthinkable.*

'The judiciary has the ultimate power, and the duty, to apply, interpret, define, and construe all words, phrases, sentences and sections of the Kentucky Constitution as necessitated by the controversies before it. It is *solely* the function of the judiciary to so do. This duty must be exercised even when such action services as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public.' " (Emphasis added.)

Almost 60 years ago the Kansas Supreme Court addressed the separation of powers issue in the non-school finance case of *Berentz v. Comm'rs of Coffeyville*, 159 Kan. 58, 152 P.2d 53 (1944). There the appellants challenged a pension act on the grounds it violated Article 2, § 17 of the Kansas Constitution. Finding the challenge meritorious, this court noted:

"[T]his court has always approached consideration of questions challenging the constitutionality of statutes with a disposition to determine them in such manner as to sustain the validity of the enactment in question. It has repeatedly recognized, as we do now, the rule that *it is the duty of the court to uphold a law whenever such action is possible. In so doing it has not, however, lost sight of the fact that constitutions are the work not of legislatures or of courts, but of the people, and when in its calm and deliberate judgment, free from the influences frequently responsible for legislative enactments, it determines rights guaranteed by its provisions have been encroached upon it has, with equal consistency, recognized its duty and obligation to declare those enactments in contravention of constitutional provisions."* (Emphasis added.) 159 Kan. at 62-63.

Our holding in *Berentz* is consistent with decisions in other states when a challenge has been made to the constitutionality of school finance systems and a separation of powers issue has arisen during the remedial phase. We agree with the conclusions drawn by one commentator reviewing those cases:

"[J]udicial monitoring in the remedial phase can help check political process defects and ensure that meaningful relief effectuates the court's decision.
    *"Thus, when these defects lead to a continued constitutional violation, judicial action is entirely consistent with separation of powers principles and the judicial role. Although state constitutions may commit educational matters to the legislative and executive branches, if these branches fail to fulfill such duties in a constitutional manner, 'the Court too must accept its continuing constitutional responsibility . . . for overview . . . of compliance with the constitutional imperative.'* Moreover, unlike federal courts, state courts need not be constrained by federalism issues of comity or state sovereignty when exercising remedial power over a state legislature, for state courts operate within the system of a single sovereign.
    "Nor should doubts about the court's equitable power to spur legislative action or to reject deficient legislation impede judicious over-sight. An active judicial role in monitoring remedy formulation is well-rooted in the courts' equitable powers. As long as such power is exercised only after legislative noncompliance, it is entirely appropriate." (Emphasis added.) Note, *"Unful-*

*filled Promise: School Finance Remedies and State Courts,*" 104 Harv. L. Rev. 1072, 1087-88 (1991).

We now turn to this court's specific concerns about whether the actual costs of providing a constitutionally adequate education were considered as to each of the formula components and the statutory formula as a whole, and whether any unjustified funding disparities have been exacerbated rather than ameliorated by H.B. 2247. In this determination we will be guided, in large part, by the A&M study, despite the State's criticism of it and our knowledge that, at best, its conclusions are dated. We do so for several reasons.

First, the A&M study is competent evidence admitted at trial and is part of the record in this appeal. See *Montoy II*, 278 Kan. at 774 (within the extensive record on appeal "there is substantial competent evidence, including the Augenblick & Myers study, establishing that a suitable education, as that term is defined by the legislature, is not being provided").

Second, the legislature itself commissioned the study to determine the actual costs to suitably and equitably fund public school systems; it also maintained the overall authority to shape the contours of the study and to correct any A&M actions that deviated from its directions during the process. (See K.S.A. 60-460[h].) As we stated in *Montoy II*:

"[T]he legislature directed that a professional evaluation be performed to determine the costs of a suitable education for Kansas school children. In authorizing the study, the legislature defined 'suitable education.' K.S.A. 2003 Supp. 46-1225(e). The Legislative Education Planning Committee (LEPC), to whom the task of overseeing the study was delegated, determined which performance measures would be utilized in determining if Kansas' school children were receiving a suitable education. The evaluation, performed by Augenblick & Myers, utilized the criteria established by the LEPC, and, in part, examined whether the current financing formula and funding levels were adequate for schools to meet accreditation standards and performance criteria. The study concluded that both the formula and funding levels were inadequate to provide what the legislature had defined as a suitable education." *Montoy II,* 278 Kan. at 773-74.

Third, the A&M study is the only analysis resembling a cost study before this court or the legislature.

Fourth, both the Board and the State Department of Education recommended that the A&M study recommendations be adopted at the time the study was completed and sent to the legislature.

With the A&M study as background, we next examine the provisions of H.B. 2247 in light of the two guiding considerations set forth in our January opinion: (1) actual costs of providing a constitutionally adequate education and (2) funding equity.

### BASE STATE AID PER PUPIL

BSAPP is the foundation upon which school district funding is built, as state financial aid to schools is determined by multiplying BSAPP by each district's "weighted enrollment." See K.S.A. 72-6410(b). When the SDFQPA was first implemented in 1992, BSAPP was set at $3,600. It remained at that level until 1995, when it was increased by $26 to $3,626. Small increases were funded each year thereafter until the 2002-03 school year. During the years of increases, the amounts ranged from an additional $22 to $50 per student. From 2002 until 2005, the statute allowed for a BSAPP of $3,890; however, only $3,863 was funded. Over the span of time from when the SDFQPA was implemented in 1992 until 2005, the legislature increased the BSAPP only a total of $263. As the plaintiffs point out, if the BSAPP had been increased to keep up with inflation, in 2001 alone the increase would have been $557. The A&M study recommended increasing the base to $4,650 in 2001, resulting in $623.3 million in additional funding (in 2001 dollars).

H.B. 2247 increases the BSAPP from $3,890 to $4,222. Only $115 of the $359 increase is "new" money; the balance was achieved by eliminating the correlation weighting and shifting those dollars to BSAPP. The $115 increase translates to $63.3 million in additional funding flowing into the financing formula for the 2005-06 school year.

The State argues the legislature considered actual costs in deciding upon the increase.

The plaintiffs point out that the legislature had the A&M study recommendations, as well as the results of a 2005 survey conducted by Deputy Commissioner of Education Dale Dennis for the Senate Education Committee. The survey, which requested cost infor-

mation from selected school districts, showed the BSAPP should be $6,057. The plaintiffs argue that the legislature ignored the A&M and Dennis figures, instead looking at historical expenditures and arbitrarily choosing a BSAPP level based on political compromises and what it believed it could afford without raising taxes.

The Board contends that the increase in the BSAPP, coupled with increases in the at-risk and bilingual weightings, provide a substantial increase in funding for those middle-sized and large districts with a high proportion of such students. By implication, this is an argument that the BSAPP increase helps equalize the funding disparity suffered by those districts.

The plaintiffs, on the other hand, claim that increasing the BSAPP only exacerbates the inequities in the system because the formula was not adjusted to make distorted weights, such as the low-enrollment weight, correspond to actual costs. For example, for every $1 of base funding that middle-sized or large districts receive, some low-enrollment districts receive $2.14. The plaintiffs assert Dr. Bruce Baker's testimony at trial and his earlier report described this effect.

At a minimum, the increased BSAPP provided for in H.B. 2247 substantially varies from any cost information in the record and from any recommendation of the Board or the State Department of Education.

## AT-RISK

H.B. 2247 increases funding for at-risk students from .10 of the BSAPP to .145. This increased weighting, when applied to the higher BSAPP, results in an increase of $26 million targeted to at-risk students. The A&M study recommended a weight of .20 for districts with 200 or fewer students, .52 for districts with 1,000 students, .59 for districts with 10,000 students, and .60 for districts with 30,000 students, resulting in a range of $1,491 to $2,790 per student (in 2001 dollars).

Both the State and the Board contend the increased funding for at-risk students is significant. The Board argues that, pending performance of a new cost study, H.B. 2247 should be viewed as a good faith effort toward legislative compliance with our January 3,

2005, opinion. The plaintiffs, on the other hand, contend that the increased funding level remains significantly lower than that recommended by the State's own expert witness in 1991, *before* the SDFQPA was enacted. That expert, Dr. Allan Odden, recommended a .25 minimum weight to provide an extra $1,000 for each eligible at-risk student.

Neither the State nor the Board contend that actual costs of educating at-risk students were considered.

## BILINGUAL

H.B. 2247 increases the weighting for bilingual programs from .2 to .395 for the 2005-06 school year and thereafter. When applied to the higher BSAPP, the result is an $11 million increase in state aid. The Board computes the effects of these changes to be an additional $1,668 per bilingual student, a 115.7 percent increase. A&M recommended that the bilingual weighting increase be based on student enrollment and that it range from .15 to .97, providing $1,118 to $4,510 per bilingual student.

The plaintiffs point out that this weighting is limited to "contact hours," usually a maximum of two hours per day for each student. This means the $1,668 amount must be reduced by ⅔, to $556 per actual bilingual student.

The State contends that it considered the actual costs of providing a suitable education for bilingual students. That contention is based solely on the House Select Committee on School Financing's reliance on historical data showing what school districts had already been spending under the financing formula we have held to be unconstitutional. The Board makes no argument as to the weighting's relationship to actual costs; it simply repeats that it regards the change in the weighting as a good faith effort toward compliance.

Although the increase in this weighting is significant, it still differs substantially from the cost information in the record.

## SPECIAL EDUCATION

H.B. 2247 provides for a multi-year phased-in increase in state reimbursement for special education excess costs from 85 percent

in the 2005-06 school year to 88 percent in 2006-07 and 91 percent in 2007-08 and thereafter. According to the evidence at trial, the State had been funding only 85 percent of the excess costs of special education. For fiscal year 2005, however, only 81.7 percent of the average excess costs of special education were funded. Reimbursement at 85 percent thus results in a total funding increase of $17.7 million for the upcoming school year.

The plaintiffs contend that anything less than 100 percent reimbursement for a district's special education costs is a failure to fund the actual costs of a suitable education. The State and the Board both disagree, contending less than 100 percent reimbursement furthers the State's policy of discouraging school districts from over-identifying students as eligible for special education money.

The defendants have failed to point to any evidence that any district has ever over-identified students; and, when asked at oral arguments, the State's counsel responded that he was not aware of any district that had intentionally inflated its number of such students to maximize reimbursement. Furthermore, the A&M study recommended a range, based on student enrollment, of weights from .90 to 1.50, resulting in a nearly $102.9 million (in 2001 dollars) increase in funding — a stark contrast to the $17.7 million provided by H.B. 2247.

### LOCAL OPTION BUDGET

H.B. 2247 provides a phased-in increase in the LOB cap from the current 25 percent to 27 percent in the 2005-06 school year, 29 percent in the 2006-07 school year, and 30 percent in the 2007-08 school year and thereafter.

The plaintiffs argue local districts have been forced to use the LOB to cover the inadequacies of state funding. They also argue the use of the LOB increases disparities and exacerbates inequities.

The Board takes issue with the legislature's failure to provide for equalization for the new level of LOB authority above 25 percent for the 2005-06 school year only. The absence of equalization means the dollars for the optional increases must come entirely

from each district's property tax base, which can worsen wealth-based disparities.

The State argues that the LOB acts as a counterweight to low-enrollment weighting, at-risk weighting, and perhaps even bilingual weighting, because the middle-sized and large districts expected to benefit from the increased LOB "receive little, if any, of these weightings."

This argument fails because increasing the LOB does not address inadequate funding of middle-sized and large districts that have high concentrations of bilingual, at-risk, minority, and special education students, high pupil-to-teacher ratios, and high dropout rates, but also have low median family incomes and low assessed property valuation. For example, the Emporia school district demonstrates that size of enrollment does not necessarily correlate with high property valuations or low numbers of students who are more costly to educate.

The original intent and purpose of the LOB was to allow individual districts to levy additional property taxes to fund enhancements to the constitutionally adequate education provided and financed under the legislative financing formula. The evidence before the trial court demonstrated that the inadequacy of the formula and its funding had forced some districts to use the LOB to fund the State's obligation to provide a constitutionally adequate education rather than enhancements. See *Montoy II*, 278 Kan. at 774. H.B. 2247 does nothing to discourage this practice.

We also agree with the plaintiffs and the Board that, in fact, the legislation's increase in the LOB cap exacerbates the wealth-based disparities between districts. Districts with high assessed property values can reach the maximum LOB revenues of the "district prescribed percentage of the amount of state financial aid determined for the district in the school year" (K.S.A. 72-6433[a][1], amended by S.B. 43, sec. 17) with far less tax effort than those districts with lower assessed property values and lower median family incomes. Thus, the wealthier districts will be able to generate more funds for elements of a constitutionally adequate education that the State has failed to fund.

## COST-OF-LIVING WEIGHTING

H.B. 2247 authorizes a new local property tax levy for cost-of-living weighting. As originally enacted, the purpose of this weighting was to "finance teacher salary enhancements." H.B. 2247, sec. 19. In S.B. 43, sec. 12, the legislature removed this limiting provision and no purpose for the additional funding is now stated in the law. This weighting is available in those districts where the average appraised value of a single-family residence exceeds 125 percent of the state average, as long as the district has already adopted the maximum LOB. This is estimated to amount to a total funding increase of $24.6 million for the 17 districts that would currently qualify.

This provision, the State asserts, is necessary to allow districts with high housing costs to recruit and retain high-quality teachers and is based on the actual costs of providing an education in those 17 districts that would qualify.

Counsel for the State could not substantiate, when asked at oral arguments, its rationale that those 17 districts pay higher salaries or would pay higher salaries to teachers or that higher education costs are linked to housing prices. Further, as the plaintiffs noted, the evidence at trial demonstrated that it is the districts with high-poverty, high at-risk student populations that need additional help in attracting and retaining good teachers.

Furthermore, we note that this weighting, like the increase in the LOB cap, demonstrates the State is not meeting its obligation to provide suitable financing. Also, as with the other property-tax based provisions of H.B. 2247 there is a potentially disequalizing effect. Moreover, since the original reason given for the enhancement, teacher salary increases, has been removed from the legislation, the funds generated can be used for any purpose.

## LOW-ENROLLMENT WEIGHTING

Low-enrollment weighting provides a sliding scale of adjustments for districts with fewer than 1,750 students; as district enrollment decreases past that number, the size of the adjustment increases. In other words, smaller school districts receive more favorable treatment based on the premise that they require addi-

tional funding to balance economies of scale at work for larger districts.

H.B. 2247 did not substantively change the low-enrollment weighting; it remains a significant component of the financing formula. Extrapolating from State Department of Education data, the plaintiffs argue that total state spending on the low-enrollment weighting in 2003-04 was $226,189,852. In comparison, total state spending in 2003-04 on at-risk students was $47,123,964 and on bilingual students was $8,352,964. The plaintiffs also note that application of the various weighting factors results in a large disparity in per pupil aid, ranging in 2002-03 from $16,968 to $5,655, and this disparity is largely caused by the low-enrollment factor.

Because of the significant impact of low-enrollment weighting on the financing formula, in our January opinion and April order we sought cost justifications for it. In response to questions from the court at oral arguments, counsel for the State could not provide any cost-based reason for using the 1,750 enrollment figure or for the weight's percentage. This absence of support is particularly troubling when we consider the disparity this low-enrollment weighting may produce. H.B. 2247 has the potential to worsen this inequity because it eliminates correlation weighting for districts with 1,750 enrollment or more. The funds allocated for correlation weighting were transferred to the BSAPP; this gives low-enrollment districts even more of the funds that previously were devoted to balancing the disparities in per pupil funding caused by the low-enrollment weighting.

## EXTRAORDINARY DECLINING ENROLLMENT

In addition to the declining enrollment provision of K.S.A. 2004 Supp. 72-6407(e)(2), H.B. 2247, as amended by S.B. 43, created two provisions concerning extraordinary declining enrollment. First, H.B. 2247 authorizes a district with "extraordinary declining enrollment," defined as declining enrollment over 3 years at a rate of 15 percent or 150 pupils per year, to apply to the Board of Tax Appeals (BOTA) for permission to levy an additional property tax if it has already adopted the maximum LOB. See H.B. 2247, sec. 29, repealed and replaced by S.B. 43, sec. 13. Currently only four

districts potentially would qualify for this provision. We will refer to this provision as the EDE-BOTA provision.

Second, H.B. 2247 requires districts entitled to equalizing supplemental capital improvements state aid on their bonds to seek approval from the Joint Committee on State Building Construction (JCSBC) prior to issuing new bonds if the district has had an "extraordinary declining enrollment," defined for purposes of this section as declining enrollment over 3 years at a rate of 5 percent or 50 pupils per year. If approval is denied, the district can still issue the bonds, but it does not receive any state aid on the bonds. See H.B. 2247, sec. 28, repealed and replaced by S.B. 43, sec. 14. We will refer to this provision as the EDE-JCSBC provision.

The State asserts that these provisions, which are intended to help districts absorb lost revenue from declining enrollments, ensure consideration of actual costs because districts seeking to access authority for this additional local tax levy must document need before BOTA or JCSBC.

The Board contends it is difficult to assess the financial impact of these provisions because the money available under them is potentially unlimited, subject to each district's willingness to tap into its property tax base, and, when the EDE-BOTA provision applies, BOTA's approval. The Board urges us to sever these provisions pending appropriate cost analysis.

The plaintiffs contend these provisions are not based upon cost and exacerbate funding inequities in two ways. First, the plaintiffs point to the EDE-JCSBC provision which allows issuance of bonds to construct new facilities but if permission is denied the district would not receive any state aid on the bonds. Plaintiffs contend that because wealthy districts with extraordinary declining enrollment such as Shawnee Mission receive no equalizing supplemental capital improvements state aid on their bonds, the new provision penalizes only districts with low property valuation and declining enrollment.

Second, the plaintiffs contend that these provisions exacerbate funding inequities because the extraordinary declining enrollment weight is added into the definition of a district's "adjusted enrollment" and thus adds to the base upon which the LOB is computed.

The effect of this is to provide 127 percent of any revenues lost from extraordinary declining enrollment. This effect is further compounded for those districts, like Shawnee Mission, that also benefit from the cost-of-living weight, which is also included in the "adjusted enrollment."

These provisions have the potential to be extremely disequalizing because they are unlimited and have been designed to benefit a very small number of school districts.

## CAPITAL OUTLAY

In support of this provision of H.B. 2247, the State relies upon an affidavit of Representative Mike O'Neal. The affidavit states the legislature was mindful that this court had noted the repeal of the capital outlay cap in its January opinion. The affidavit also states the decision to reimpose the cap at 8 mills was made after the legislature reviewed data from the Department of Education and heard from various districts. The Board does not offer any information as to whether actual costs were considered with respect to this provision.

The plaintiffs do not specifically address the extent to which actual costs were considered in imposing the new cap on capital outlay. The plaintiffs argue that, although H.B. 2247 reimposes a cap on the capital outlay authority, it still is disequalizing because it grandfathers those districts with a higher capital outlay resolution in place for up to 4 more years.

The State argues, without elaboration, that the 8 mill cap reflects the legislature's attempt to improve wealth equalization. The Board encourages the court to view this change favorably, despite the local property tax basis of this factor.

Because the provision is based on local property tax authority, the amount of revenue a district can raise is tied to property value and median family income; thus the failure to provide any equalization to those districts unable to access this funding perpetuates the inequities produced by this component.

## FINANCING FORMULA AS A WHOLE

With regard to the financing formula as a whole, the parties

basically restate the same arguments they made regarding the formula's components. The State claims that the increased funding provided by H.B. 2247 alleviates this court's constitutional concerns. The Board disagrees, but it considers the increased funding a good faith initial effort toward compliance and an installment on the first remedy year toward what may very well be a much larger obligation based on the evidence in this case. The plaintiffs argue the increases in funding "fall grossly short of what is actually necessary to provide a constitutionally suitable education." The State contends that overall it considered, to the extent possible, actual costs, including the A&M study. The plaintiffs respond that actual costs were not considered; rather the financing formula as amended by H.B. 2247 is merely a product of political compromise and the legislative majority's unwillingness to consider raising taxes to increase funding of schools. The Board argues H.B. 2247 does not fund actual costs and has many inequities.

We agree with the Board that although H.B. 2247 does provide a significant funding increase, it falls short of providing constitutionally adequate funding for public education. It is clear that the legislature did not consider what it costs to provide a constitutionally adequate education, nor the inequities created and worsened by H.B. 2247. At oral arguments, counsel for the State could not identify any cost basis or study to support the amount of funding provided by H.B. 2247, its constellation of weightings and other provisions, or their relationships to one another.

Particularly, we share the plaintiffs' and Board's concern that H.B. 2247's increased dependence on local property taxes, as decided by each school district, exacerbates disparities based on district wealth. We fully acknowledge that once the legislature has provided suitable funding for the state school system, there may be nothing in the constitution that prevents the legislature from allowing school districts to raise additional funds for enhancements to the constitutionally adequate education already provided. At least to the extent that funding remains constitutionally equalized, local assessments for this purpose may be permissible. Clearly, however, such assessments are not acceptable as a substitute for

the state funding the legislature is obligated to provide under Article 6, § 6. That should pre-exist the local tax initiatives.

As of this time, the legislature has failed to provide suitable funding for a constitutionally adequate education. School districts have been forced to use the LOB to supplement the State's funding as they struggle to suitably finance a constitutionally adequate education, a burden which the constitution places on the State, not on local districts. The result is wealth-based disparity because the districts with lower property valuations and median incomes are unable to generate sufficient revenue. Because property values vary widely, a district's ability to raise money by the required mill levy also varies widely. The cost-of-living weighting and extraordinary declining enrollment provision also have the potential to exacerbate inequity. A higher LOB cap, cost-of-living weighting, and the extraordinary declining enrollment provisions cannot be allowed to exacerbate inequities while we wait for the legislature to perform its constitutional duty.

We conclude that, on the record before us, a continuing lack of constitutionally adequate funding together with the inequity-producing local property tax measures mean the school financing formula, as altered by H.B. 2247, still falls short of the standard set by Article 6, § 6 of the Kansas Constitution.

## COST STUDY

As we prepare to consider an appropriate remedy and the mechanisms necessary to assure that future school financing will meet the requirements of the constitution, we agree with all parties that a determination of the reasonable and actual costs of providing a constitutionally adequate education is critical. H.B. 2247 provides for a Legislative Post Audit "cost analysis study."

Section 3 of the legislation reads in relevant part:

"(a) In order to assist the legislature in the gathering of information which is necessary for the legislature's consideration when meeting its constitutional duties to: (1) Provide for intellectual, educational, vocational and scientific improvement in public schools established and maintained by the state; and (2) make suitable provision for the finance of educational interests of the state, the division of post audit shall conduct a professional cost study analysis to determine the costs of

delivering the kindergarten and grades one through 12 curriculum, related services and other programs mandated by state statute in accredited schools. . . .

"(b) Any study conducted pursuant to subsection (a) shall include:

(1) A determination of the services or programs required by state statute to be provided by school districts. Such review shall include high school graduation requirements, admissions requirements established by the state board of regents pursuant to K.S.A. 76-716, and amendments thereto, state scholarship requirements established by the state board of regents and courses of instruction at various grade levels required by state statute.

(2) A study of the actual costs incurred in a sample of school districts to provide reasonable estimates of the costs of providing services and programs required by state statute to be provided by school districts for regular elementary and secondary education, including instruction, administration, support staff, supplies, equipment and building costs.

(3) A study of the actual costs incurred in a sample of school districts to provide reasonable estimates of the costs of providing services and programs required by state statute to be provided by school districts for specialized education services including, but not limited to, special education and related services, bilingual education and at-risk programs.

(4) A study of the factors which may contribute to the variations in costs incurred by school districts of various sizes and in various regions of the state when providing services or programs required by state statute to be provided by school districts. Such study shall include the administrative costs of providing such services and programs.

(5) An analysis in a sample of districts as determined by the legislative post auditor showing such things as:

(A) The percent of the estimated cost of providing services and programs required by state statute that could have been funded by the various types of state aid the districts received in the most recently completed school year, as well as the percent funded by the district's local option budget;

(B) the percent of district funding that is spent on instruction;

(C) the percent of district funding that is spent on central administration; and

(D) the percent of district funding that is spent on support services.

(6) A review of relevant studies that assess whether there is a correlation between amounts spent on education and student performance.

(7) A review to determine whether students who are counted as a basis for computing funding for specialized educational services are actually receiving those services.

(8) Any additional reviews or analyses the legislative post auditor considers relevant to the legislature's decisions regarding the cost of funding services or programs required by state statute to be provided by school districts.

. . . .

"(d) Following the completion of such cost analysis study, the legislative post auditor shall submit a detailed report thereon to the legislature on or before the

first day of the 2006 legislative session. If additional time is needed to provide the most accurate information relating to any area of requested study, the legislative post auditor shall so report to the legislature, explaining the reasons for the need for additional time and providing a reasonable time frame for completion of that aspect of the study. In that event, the legislative post auditor shall submit a report on that portion of the study which has been completed before the start of the 2006 legislative session and the balance of such report shall be submitted within the time frame established by the legislative post auditor when requesting additional time." H.B. 2247, sec. 3.

The plaintiffs and the Board contend that the H.B. 2247 study is designed merely to determine the amounts of historical expenditures under the system and that the legislature will then equate those expenditures to reasonable and actual costs of a future system we should find constitutional. This characterization is not entirely correct.

Although the language of the statute is not completely clear, it can be read to require post audit, among other things, to study historical costs in a sample of districts and then extrapolate from the collected data a reasonable estimate of the future cost of providing services and programs "required by state statute." Estimating future reasonable and actual costs based on historical expenditures can be acceptable if post audit ensures that its examination of historical expenditures corrects for the recognized inadequacy of those expenditures and ensures that a reliable method of extrapolation is adopted. Post audit must incorporate those components into its study, and its report to the legislature must demonstrate how the incorporation was accomplished.

It also appears that the study contemplated by H.B. 2247 is deficient because it will examine only what it costs for education "inputs" — the cost of delivering kindergarten through grade 12 curriculum, related services, and other programs "mandated by state statute in accredited schools." It does not appear to demand consideration of the costs of "outputs" — achievement of measurable standards of student proficiency. As the Board pointed out in its brief, nowhere in H.B. 2247 is there specific reference to K.S.A. 72-6439(a) or (c), which provided the criteria used by this court in our January 2005 opinion to evaluate whether the school financing formula provided a constitutionally adequate education.

H.B. 2247 also does not mention educational standards adopted by the Board pursuant to its constitutional responsibilities under Article 6, § 2(a) or in fulfilling its statutory directives. Without consideration of outputs, any study conducted by post audit is doomed to be incomplete. Such outputs are necessary elements of a constitutionally adequate education and must be funded by the ultimate financing formula adopted by the legislature. See *Montoy II*, 278 Kan. at 773 (quoting K.S.A. 72-6439) (constitutionally suitable education is one in which "schools meet the accreditation requirements and [students are] achieving an 'improvement in performance that reflects high academic standards and is measurable.' "); see also Kan. Const., Art. 6, § 1 (legislature shall provide for intellectual, educational, vocational, and scientific *improvement*). The post audit study must incorporate the consideration of outputs and Board statutory and regulatory standards, in addition to statutorily mandated elements of kindergarten through grade 12 education. Further, post audit's report to the legislature must demonstrate how this consideration was accomplished.

The study parameters in H.B. 2247 do provide for analysis of the percentages of sample school district spending on instruction, central administration, and support services. They also specifically provide for exploration of several components of the current financing formula. We endorse these provisions with the exception that all administrative costs, not just costs of central administration, must be analyzed. All of this information should assist post audit and, eventually, the legislature and this court in evaluating the reasonableness or appropriateness of cost estimates. Suitable finance of a constitutionally adequate education does not necessarily include every item each school district or student *wants*; its focus must be on *needs* and the appropriate costs thereof.

## REMEDY

In light of the legislature's unsatisfactory response to our January opinion we are again faced with the need to order remedial action. See *Montoy II*, 278 Kan. at 775 ("The legislature, by its action or lack thereof in the 2005 session, will dictate what form our remedy, if necessary, will take."). We are guided not only by our interpre-

tation of Article 6, § 6, but also by the present realities and common sense. Time is running out for the school districts to prepare their budgets, staff their classrooms and offices, and begin the 2005-06 school year. School districts need to know what funding will be available as soon as possible.

The legislature has known for some time that increased funding of the financing formula would be necessary. In July 2002, the Kansas Department of Education prepared a computation of the cost of implementing the recommendations in the A&M study. Calculated in 2001 dollars the total cost of the increase would have been $725,669,901 for each school year. Additionally, the Department adjusted that number because of changes in LOB funding and applied a 2 percent inflation factor for each of the school years of 2001-02, 2002-03, and 2003-04. The resulting number was an increase in costs of approximately $853 million. As noted, the A&M study was commissioned by the legislature, monitored by the legislature's committees, paid for by the legislature with tax dollars, and received by the legislature. Although the State claims it considered the A&M study, it in fact chose to impugn its design and ignore its recommendations. It can no longer do so.

This case is extraordinary, but the imperative remains that we decide it on the record before us. The A&M study, and the testimony supporting it, appear in the record in this case. The State cites no cost study or evidence to rebut the A&M study, instead offering conclusory affidavits from legislative leaders. Thus the A&M study is the only analysis resembling a legitimate cost study before us. Accordingly, at this point in time, we accept it as a valid basis to determine the cost of a constitutionally adequate public education in kindergarten through the 12th grade. The alternative is to await yet another study, which itself may be found legislatively or judicially unacceptable, and the school children of Kansas would be forced to further await a suitable education. We note that the present litigation was filed in 1999.

The initial attractiveness of the Board's suggestion that we accept H.B. 2247 as an interim step toward a full remedy pales in light of the compelling arguments of immediate need made by the plaintiffs and *amici curiae*. They remind us that we cannot continue to

ask current Kansas students to "be patient." The time for their education is now. As the North Carolina Supreme Court eloquently stated:

"The children . . . are our state's most valuable renewable resource. If inordinate numbers of them are wrongfully being denied their constitutional right to the opportunity for a sound basic education, our state courts cannot risk further and continued damage because the perfect civil action has proved elusive. We note that the instant case commenced ten years ago. If in the end it yields a clearly demonstrated constitutional violation, ten classes of students as of the time of this opinion will have already passed through our state's school system without benefit of relief. We cannot similarly imperil even one more class unnecessarily." *Hoke Cty Bd. of Educ. v. State,* 358 N.C. 605, 616, 599 S.E.2d 365 (2004).

As set forth earlier in this opinion, the Legislative Division of Post Audit has been commissioned to conduct a comprehensive and extensive cost study to be presented to the 2005-06 legislature. With such additional information available, the legislature should be provided with the cost information necessary to make policy choices establishing a suitable system of financing of Kansas public schools.

We conclude, however, that additional funding must be made available for the 2005-06 school year to assist in meeting the school districts' immediate needs. We are mindful of the Board's argument that there are limits on the amount the system can absorb efficiently and effectively at this point in the budget process. We further conclude, after careful consideration, that at least one-third of the $853 million amount reported to the Board in July of 2002 (A&M study's cost adjusted for inflation) shall be funded for the 2005-06 school year.

Specifically, no later than July 1, 2005, for the 2005-06 school year, the legislature shall implement a minimum increase of $285 million above the funding level for the 2004-05 school year, which includes the $142 million presently contemplated in H.B. 2247. In deference to the cost study analysis mandated by the legislature in H.B. 2247, the implementation beyond the 2005-06 school year will be contingent upon the results of the study directed by H.B. 2247 and this opinion.

Further, if (1) the post audit study is not completed or timely submitted for the legislature to consider and act upon it during the 2006 session, (2) the post audit study is judicially or legislatively determined not to be a valid cost study, or (3) legislation is not enacted which is based upon actual and necessary costs of providing a suitable system of finance and which equitably distributes the funding, we will consider, among other remedies, ordering that, at a minimum, the remaining two-thirds ($568 million) in increased funding based upon the A&M study be implemented for the 2006-07 school year.

Clearly, the legislature's obligation will not end there; the costs of education continue to change and constant monitoring and funding adjustments are necessary. H.B. 2247's provisions regarding establishment of the 2010 Commission and mandating annual increases based upon the Consumer Price Index may satisfy these demands, but the legislature may seek other means to assure that Kansas school children, now and in the future, receive a constitutionally adequate education.

In addition, on the rationale previously expressed, the new funding authorized by H.B. 2247's provisions regarding the increased LOB authority over 25 percent, the cost-of-living weighting, and both extraordinary declining enrollment provisions are stayed. The remainder of H.B. 2247, as amended by the legislature in compliance with this opinion, shall remain in effect for the 2005-06 school year.

We readily acknowledge that our present remedy is far from perfect; indeed, we acknowledge that it is merely a balancing of several factors. Among those factors are:

(1) The ever-present need for Kansas school children to receive a constitutionally adequate education. *Montoy II*, 278 Kan. at 773.

(2) The role of this court as defined in the Kansas Constitution. See *Berentz v. Comm'rs of Coffeyville*, 159 Kan. 58, 152 P.2d 53 (1944).

(3) The need for the legislature to bring its school finance legislation into constitutional compliance, with acknowledgment of the unique difficulties inherent in the legislative process.

(4) The press of time caused by the rapidly approaching school year.

Accordingly, we retain jurisdiction of this appeal. If necessary, further action will be taken by this court as is deemed advisable to ensure compliance with this opinion.