Diane PETRELLA, next friend and guardian of minor N.P., minor C.P.; Nick Petrella, next friend and guardian of minor N.P.; minor C.P., Michelle Trouve', next friend and guardian of minor J.T., minor Z.T., minor N.T.; Marc Trouve', next friend and guardian of minor J.T., minor Z.T., minor N.T.; Meredith Bihuniak, next friend and guardian of minor S.B., minor O.B., minor A.B., minor E.B.; Chris Bihuniak, next friend and guardian of minor S.B., minor O.B., minor A.B., minor E.B.; Mike Washburn, next friend and guardian of minor A.W., minor R.W.; Laurence Florens, next friend and guardian of minor A.W., minor R.W.; Paul Erdner, next friend and guardian of minor M.E., minor A.E.; Julie Erdner, next friend and guardian of minor M.E., minor A.E.; Christophe Sailly, next friend and guardian of minor E.S., minor N.S.; Catalina Sailly, next friend and guardian of minor E.S., minor N.S.; John Webb Roberts, next friend and guardian of minor M.C.R., minor W.C.R.; Terre Manne, next friend and guardian of minor C.J.M.; Alison Barnes Martin, next friend and guardian of minor C.O.M., minor C.E.M.; Kurt Kuhnke, next friend and guardian of minor A.K.; Lisa Kuhnke, next friend and guardian of minor A.K., Plaintiffs–Appellants,

v.

Sam BROWNBACK, Governor of Kansas, in his official capacity; Derek Schmidt, Kansas Attorney General, in his official capacity; Ron Estes, Kansas State Treasurer, in his official capacity, Dr. Diane Debacker, in her official capacity as Kansas Commissioner of Education; Janet Waugh, in her official capacity as Chair of the Kansas State Board of Education; Kathy Martin, in her official capacity as a member of the State Board of Education; Sue Storm, in her official capacity as a member of the Kansas State Board of Education; Kenneth Willard, in his official capacity as a member of the Kansas State Board of Education; John W. Bacon, in his official capacity as a member of the Kansas State Board of Education; Dr. Walt Chappell, in his official capacity as a member of the Kansas State Board of Education; Carolyn L. Wims–Campbell, in her official capacity as a member of the Kansas State Board of Education; Jana Shaver, in her official capacity as Vice–Chair of the Kansas State Board of Education; Sally Cauble, in her official capacity as a member of the Kansas State Board of Edu-

cation; David T. Dennis, in his official capacity as a member of the Kansas State Board of Education; Defendants–Appellees,

and

Evette Hawthorne–Crosby, next friend and guardian of minor B.C.; Joy Holmes, next friend and guardian of minor J.H.; Jim Holmes, next friend and guardian of minor J.H.; Jennifer Kennedy, next friend and guardian of minor O.K.; George Mendez, next friend and guardian of minor G.M.; Eva Herrera, next friend and guardian of minor D.H., minor G.H., minor K.H.; Monica Mendez, next friend and guardian of minor G.M.; Ramon Murguia, next friend and guardian of minor A.M.; Sally Murguia, next friend and guardian of minor A.M.; Ivy Newton, next friend and guardian of minor L.N.; Matt Newton, next friend and guardian of minor L.N.; Schelena Oakman, next friend and guardian of minor C.O.; Clara Osborne, next friend and guardian of minor N.W.; Misty Seeber, next friend and guardian of minor A.S., minor B.S.; David Seeber, next friend and guardian of minor A.S., minor B.S.; John Cain, next friend and guardian of minor L.C.; Becky Cain, next friend and guardian of minor L.C.; Meredith Gannon, next friend and guardian of minor L.G., minor A.G., minor G.G.; Jeff Gannon, next friend and guardian of minor L.G., minor A.G., minor G.G.; Andrea Burgess, next friend and guardian of minor J.B.; Martha Pint, next friend and guardian of minor C.P.; Darrin Cox, next friend and guardian of minor J.C.; Lois Cox, next friend and guardian of minor J.C.; Danie Eldredge, next friend and guardian of minor A.E.; Josh Eldredge, next friend and guardian of minor A.E.; Glenn Owen, next friend and guardian of minor A.O.; Ryan Rank, next friend and guardian of minor M.R.; Beulah Walker, next friend and guardian of minor Q.W.; Bianca Alvarez, next friend and guardian of minor M.A.; Norma Del Real, next friend and guardian of minor P.D., minor V.D.; Adriana Figueroa, next friend and guardian of minor T.F.; Rebecca Fralick, next friend and guardian of M.S.; Consuelo Treto, next friend and guardian of minor A.T.; Melissa Bynum, next friend and guardian of minor T.B.; Bryant Crosby, next friend and guardian of minor B.C., Defendant Intervenors–Appellees.

Blue Valley Unified School District No. 229; Shawnee Mission Unified School District No. 512, Amici Curiae.

Nos. 13–3334, 14–3023.

United States Court of Appeals, Tenth Circuit.

June 1, 2015.

Tristan L. Duncan, Shook, Hardy & Bacon, Kansas City, MO, (Zach Chaffee–McClure, William F. Northrip, Manuel Lopez and Scott E. Dupree, Shook, Hardy &

Bacon, Kansas City, MO; Jonathan S. Massey, Massey & Gail, Washington, D.C.; Laurence H. Tribe, Cambridge, MA, with her on the briefs), for Plaintiffs–Appellants.

Arthur S. Chalmers, Hite, Fanning & Honeyman, Wichita, KS, (Gaye B. Tibbets, Hite Fanning & Honeyman, Wichita, KS; Jeffrey A. Chanay, Office of the Attorney General for the State of Kansas, Topeka, KS; Mark A. Ferguson, Eldon J. Shields, Gates, Shields & Ferguson, Overland Park, KS, Cheryl L. Whelan, Kansas State Department of Education, Topeka, KS, with him on the brief), for Defendants–Appellees.

Alan L. Rupe, Lewis, Brisbois, Bisgaard & Smith, Wichita, KS; (John S. Robb, Somers, Robb and Robb, Newton, KS, with him on the brief), for Defendant Intervenors–Appellees.

Charles W. German and Daniel B. Hodes, Rouse Hendricks German May, Kansas City, MO, with him on the brief, for Amici Curiae.

Before KELLY, LUCERO, and HARTZ, Circuit Judges.

LUCERO, Circuit Judge.

More than six decades ago, the Supreme Court declared school segregation in Topeka, Kansas unconstitutional. *Brown v. Bd. of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Since then, Kansas state courts have adjudicated numerous challenges to the state's school financing system, seeking to effectuate *Brown*'s ideals and the Kansas Constitution's mandate that school financing be "suitable." Kan. Const. art. 6, § 6(b). Through this history of litigation and remarkably direct communication between the state's three branches of government, Kansas has developed a school financing scheme that seeks to avoid "mak[ing] the quality of a child's education a function of his or her parent's or neighbors' wealth." *Montoy v. State*, 282 Kan. 9, 138 P.3d 755, 769 (2006) (Rosen, J., concurring). Just last year, the Kansas Supreme Court reaffirmed that "[e]ducation in Kansas is not restricted to that upper stratum of society able to afford it." *Gannon v. State*, 298 Kan. 1107, 319 P.3d 1196, 1239 (2014) (per curiam).

Displeased with the outcome of school finance litigation in state court, plaintiffs, parents of students in the relatively wealthy Shawnee Mission School District ("SMSD"), seek federal intervention to upend decades of effort toward establishing an equitable school finance system in Kansas. Adopting a kitchen-sink approach, they claim that aspects of the state's school financing regime violate their rights to free speech, to petition the government, to associate, to vote, to education, to equal protection of the laws, to direct the upbringing of their children, and to dispose of their property. Stripped to its pith, plaintiffs' position is that the U.S. Constitution requires the state of Kansas to grant its political subdivisions unlimited taxing and budget authority. We discern no support for their novel and expansive claims. Exercising jurisdiction under 28 U.S.C. § 1292(a)(1), we affirm the district court's orders denying plaintiffs' motion for a preliminary injunction, granting in part defendants' motions to dismiss, and denying reconsideration.

I

A

Since it was admitted into the Union, "Kansas has financed public schools through taxes and other mechanisms provided for by the legislature, not by local districts." *Unified Sch. Dist. No. 229 v. State*, 256 Kan. 232, 885 P.2d 1170, 1175 (1994) ("*USD 229*"). Through most of

Kansas history, public schools were funded principally through local taxes, with school districts operating "pursuant to the powers and limitations granted by the legislature," including "minimum ad valorem tax levies or floors as well as maximum levies or caps." *Id.* at 1175–76. In 1937, Kansas began providing supplemental funding to school districts. *See id.* at 1176.

In 1966, the people of Kansas ratified amendments to the Kansas Constitution concerning education finance. *Id.* As amended, it provides that "[t]he legislature shall make suitable provision for finance of the educational interests of the state." Kan. Const. art. 6, § 6(b). Not long afterwards, a Kansas state court held the existing state education-financing statute unconstitutional. *See USD 229,* 885 P.2d at 1177 (citing *Caldwell v. State,* No. 50616 (Johnson Cnty. Kan. D. Ct., Aug. 30, 1972)). It concluded that the statute relied too heavily on local financing, "thereby making the educational system of the child essentially the function of, and dependent on, the wealth of the district in which the child resides." *Id.* (quoting *Caldwell* ). In response, the Kansas legislature enacted a new statute that diminished the effect of differential local financing by distributing state funds to poorer districts. *Id.*

Reacting to further legal challenges, the Kansas legislature passed the School District Finance and Quality Performance Act ("SDFQPA") in 1992. *Id.* at 1177–78. Under the SDFQPA, Kansas distributes State Financial Aid to school districts under a formula that accounts for differences in the cost of educating each district's student population. State Financial Aid consists of Base State Aid Per Pupil ("BSAPP"), a fixed dollar amount, multiplied by adjusted enrollment. The term "adjusted enrollment" refers to the number of students who attend school in a district, modified to take into account various factors that indicate certain students are more expensive to educate. For example, each English–Language–Learning ("ELL") student enrolled in a bilingual education program counts as 1.395 students for adjusted enrollment purposes. The same weighting formula is applied uniformly to all Kansas school districts. As a general matter, poorer districts, because their students are more costly to educate, receive more State Financial Aid than wealthier districts with students that are less costly to educate.

■ State Financial Aid represents the amount of money to which districts are entitled, but the state does not directly provide that full amount. Under Kansas law, school districts have only those powers delegated to them by the state legislature. *See Wichita Pub. Sch. Emps. Union, Local No. 513 v. Smith,* 194 Kan. 2, 397 P.2d 357, 359 (1964). Like its predecessor statutes, the SDFQPA delegates limited taxing authority to local school districts. It requires all districts to levy a local property tax of 20 mills. Kan. Stat. § 72–6431(b). That amount, when combined with revenue from a few other local taxes, is known as the "local effort." If a district's local effort is less than the State Financial Aid to which it is entitled, the state provides "General State Aid" to make up the difference. If a district raises more than its State Financial Aid total through local effort, it must remit the excess funds to the state.

The SDFQPA also permits, but does not require, school districts to impose an additional local property tax to fund a "Local Option Budget" ("LOB"). *See* Kan. Stat. § 72–6435. A district's LOB is capped at a certain percent of its State Financial Aid entitlement, *see* Kan. Stat. § 72–6433, a limit known as the "LOB cap." At the time the SDFQPA was enacted, the LOB cap was 25%.

Objecting to the SDFQPA's need-based formula and its restrictions on local funding, several school districts, including amicus Blue Valley School District ("BVSD"), challenged the SDFQPA on equal protection grounds. *USD 229*, 885 P.2d at 1187. The Kansas Supreme Court held that the SDFQPA should not be reviewed under any form of heightened scrutiny because no suspect classes or fundamental rights were implicated, and upheld the statute after concluding that the Kansas legislature had a rational basis for its enactment. *Id.* at 1187–92. The court reasoned that "[r]eliance solely on local property tax levies would be disastrous for the smaller and/or poorer districts which have depended on state aid for many years." *Id.* at 1191.

The legislature subsequently amended the SDFQPA, loosening the LOB cap in various ways that allowed school districts to raise additional funds at the local level. A coalition of poorer students and school districts challenged these amendments. The Kansas Supreme Court reversed a dismissal of that action, ruling that the trial court failed to adequately consider the performance gap between wealthy and poor students. *Montoy v. State*, 275 Kan. 145, 62 P.3d 228, 235 (2003) ("*Montoy I*"). On remand, the trial court declared that the revised SDFQPA violated both the U.S. and Kansas Constitutions, in part because "LOBs, as their use has evolved, create wealth-based disparities in per pupil revenues for Kansas schools." *Montoy v. State*, No. 99–C–1738, 2003 WL 22902963, at *33 (Kan. Dist. Ct. Shawnee Cnty. Dec. 2, 2003) (unpublished) ("*Montoy II*"). The Kansas Supreme Court affirmed, concluding that the SDFQPA did not fulfill the Kansas Constitution's mandate that the state make "suitable" provision for the finance of public education. *Montoy v.*

*State*, 278 Kan. 769, 120 P.3d 306, 310 (2005) ("*Montoy III*"). It required the legislature to take corrective action, specifically noting that "[t]he equity with which [education] funds are distributed ... [is a] critical factor[ ] for the legislature to consider in achieving a suitable formula for financing education." *Id.*

After *Montoy III*, the Kansas legislature made additional changes, including an increase to the LOB cap. Dissatisfied with this response, the Kansas Supreme Court held that the amended SDFQPA remained unconstitutional, partly because "the legislation's increase in the LOB cap exacerbates the wealth-based disparities between districts." *Montoy v. State*, 279 Kan. 817, 112 P.3d 923, 934 (2005) ("*Montoy IV*").[1] The court explained that

> [d]istricts with high assessed property values can reach the maximum LOB revenues ... with far less tax effort than those districts with lower assessed property values and lower median family incomes. Thus, the wealthier districts will be able to generate more funds for elements of a constitutionally adequate education that the State has failed to fund.

*Id.*

The Kansas legislature again amended the SDFQPA, strengthening a provision that allows poorer districts to receive Supplemental General State Aid ("SGSA") if they are unable to raise as much LOB revenue as wealthier districts. This time, the Kansas Supreme Court upheld the revised statute. *Montoy v. State*, 282 Kan. 9, 138 P.3d 755, 765–66 (2006) ("*Montoy V*"). It held that

> [t]he legislature ... responded to our concerns about the equitable distribution of funding. Equity does not require the legislature to provide equal funding for

---

1. SMSD, which is an amicus in this case, was also an amicus in *Montoy III* and *Montoy IV*.

each student or school district.... What is required is an equitable and fair distribution of the funding to provide an opportunity for every student to obtain a suitable education.

*Id.* at 764.

In the wake of the 2008 financial crisis and ensuing recession, the Kansas legislature reduced the amount of SGSA it provided to poorer districts. A coalition of plaintiffs, intervenors in this case, once again sued. In March 2014, the Kansas Supreme Court held that reducing SGSA payments to poorer districts violated the equity mandate of Article 6 of the Kansas Constitution. *Gannon v. State*, 298 Kan. 1107, 319 P.3d 1196, 1243–47 (2014). The court reaffirmed its prior holdings that "[e]ducation in Kansas is not restricted to that upper stratum of society able to afford it," and that, under the Kansas Constitution, "[s]chool districts must have reasonably equal access to substantially similar educational opportunity through similar tax effort." *Id.* at 1239. By reducing SGSA payments, the legislature unreasonably exacerbated the "level of wealth-based disparity inherent in the LOB...." *Id.* at 1246. The legislature responded by yet again amending the SDFQPA. Among other changes, the legislature raised the LOB cap to 33% of State Financial Aid.

After briefing was completed in this appeal, the Kansas legislature replaced the SDFQPA with the Classroom Learning Assuring Student Success Act ("CLASS Act"). *See* 34 Kan. Reg. 272, § 4(a) (April 2, 2015).[2] The CLASS Act provides block grants to school districts for the 2015–16 and 2016–17 school years. *Id.*, § 4(b)(3). The block grant amounts are determined by taking the amount of General State Aid to which districts were entitled under the SDFQPA for the 2014–15 school year, and making certain adjustments. *Id.*, § 6. The CLASS Act also contains a LOB cap, authorizing school districts to levy an ad valorem tax to fund a LOB "which does not exceed the greater of: (1) The local option budget adopted by such school district for school year 2014–2015 pursuant to [Kan. Stat. § ] 72–6433, prior to its repeal; or (2) the local option budget such school district would have adopted for school year 2015–2016 pursuant to [Kan. Stat. § ] 72–6433, prior to its repeal." 34 Kan. Reg. 274, § 12(a); *see also id.*, § 13(a) (authorizing tax levy).[3]

**B**

SMSD, where plaintiffs' children attend school, is located in Johnson County, in the Kansas City suburbs. It is the third largest school district in Kansas by population, and among the wealthiest districts in the state. SMSD has the highest total assessed property value of any district in the state. It is also one of the top-performing school districts in Kansas. SMSD's ACT and SAT scores substantially exceed state and national averages, over 84% of its teachers hold master's degrees or higher, and it was the only Kansas school district to place on the College Board's Advanced Placement Achievement List in 2011. In 2014, SMSD announced that it was providing all high school students a MacBook Air and all middle school students an iPad Air.

---

2. We sua sponte take judicial notice of this statute, and admonish the parties for failing to apprise the court of this development. *See United States v. Coffman*, 638 F.2d 192, 194 (10th Cir.1980) ("That the courts are allowed to take judicial notice of statutes is unquestionable.").

3. Because the CLASS Act has not yet been codified, we cite to the prior versions of the Kansas Statutes throughout this opinion.

In recent years, the student population throughout Kansas has become less affluent and more diverse. SMSD is no exception. Its percentage of low-income and ELL students has increased more rapidly than in the state as a whole. As a result, SMSD received more State Financial Aid per pupil in recent years than it had in the past, because its weighted enrollment accounts for the influx of students who are more expensive to educate. SMSD nevertheless remains much more affluent than most other large school districts in Kansas. In the 2012–13 school year, 36.84% of SMSD students received free or reduced-price lunches, compared to 88.65% of students in the neighboring Kansas City School District, 76.51% in the Wichita School District, and 75.77% in the Topeka Public Schools.

Although the percentage of low-income and ELL students enrolled in SMSD has recently increased, overall enrollment in SMSD has declined. The district's enrollment peaked in 1971 at 45,702 students, and declined to 27,437 students in 2013. Enrollment declined by nearly 10% between 2000 and 2009 alone, and SMSD predicts that its student population will continue dropping. As enrollment declined and school buildings aged, SMSD regularly closed under-capacity schools, including 21 elementary schools and three junior high schools. In 2010, the district proposed closing five under-capacity schools and adjusting attendance areas in order to account for declining enrollment. Many parents of children who attended the schools slated for closure, including some plaintiffs in this case, attributed the closures to a lack of funding.

Around the same time, SMSD, like school districts nationwide, faced budget cuts due to the recession. Partly as a result, many teaching positions were eliminated. None of these cuts were a direct result of the 2010 school closures. SMSD faced difficult choices in addressing its declining enrollment and reduced budget, influenced by many variables. Its decision to cut positions and close schools reflected a choice to continue paying its staff high wages as compared to other districts. SMSD pays its teachers more than any other district in Kansas, and it ranks second to amicus BVSD in principal and superintendent salaries. Partially as a result of SMSD continuing to pay high teacher salaries while cutting positions, in the 2011–2012 school year, SMSD had a pupil-teacher ratio of 17.2, which is somewhat higher than other large Kansas school districts. The pupil-teacher ratio that year was 17.1 in BVSD, 15.9 in Kansas City, 15.9 in Wichita, and 15.3 in Topeka.

Because SMSD contains fewer low-income students, it costs less on average to educate students in SMSD than in many other Kansas school districts. Additionally, because SMSD has the highest total assessed property value of any district in the state, and one of the highest assessed property values per pupil, it raises most of its State Financial Aid entitlement through local effort. Thus, as plaintiffs note, SMSD receives less General State Aid per pupil than less-affluent districts, which raise less of their State Financial Aid entitlement locally and have higher weighted enrollments because their students tend to be more expensive to educate.

However, looking to the amount of General State Aid SMSD receives would ignore relevant differences between it and other districts. For example, before the district court, plaintiffs highlighted two districts, Greensburg and Chapman, which receive more General State Aid per pupil than SMSD does. Those districts received additional funding to rebuild after their school buildings were destroyed by tornadoes. Similarly, on appeal, plaintiffs note

that the Kansas City, Dodge City, Hutchinson, and Wichita school districts, where intervenors' children attend school, receive substantially more General State Aid per pupil than SMSD. But all four of these districts have relatively high weighted enrollments because their students are more expensive to educate. And because those districts have smaller tax bases than SMSD, they raise less of their State Financial Aid entitlement locally.

None of the methods of measuring a school district's per-pupil budget include money donated by parents, foundations, and other sources, unless that money is spent to pay teacher salaries. Parents and other interested parties in Kansas are free to donate money to school districts in a variety of ways. For example, SMSD benefactors have formed the Shawnee Mission Education Foundation, which has contributed over $3.5 million in grants and gifts to the district. Additionally, Johnson County voters previously approved a countywide sales tax, which was projected to raise $42 million in revenue, a portion of which is to be distributed among several Johnson County school districts. This approval reflects a broader trend of Johnson County voters, and specifically SMSD voters, being inclined to approve education taxes. Since 1992, they have voted to approve every tax increase for education put before them.

Plaintiffs hope to use the pro-tax sentiment in SMSD to raise their LOB, but are prevented from doing so by the LOB cap. In 2010 plaintiffs sued various Kansas state officials, seeking to enjoin enforcement of the LOB cap. The district court dismissed their suit for lack of standing. We reversed, in an opinion limited solely to the issue of standing. *Petrella v. Brownback*, 697 F.3d 1285, 1292 (10th Cir. 2012) ("*Petrella I* "). On October 29, 2013, the district court denied plaintiffs' motion

for a preliminary injunction and their motion for summary judgment, and granted defendants' motions to dismiss in part. *Petrella v. Brownback*, 980 F.Supp.2d 1293, 1296–97 (D.Kan.2013) ("*Petrella II* "). The district court dismissed the claims that were based on a theory that the LOB cap is subject to heightened scrutiny, but allowed plaintiffs' claims under rational basis review to proceed. *Id.* at 1310. Plaintiffs filed a motion for reconsideration, and a notice of appeal. After the district court denied their motion for reconsideration, plaintiffs filed a second notice of appeal. We consolidated the appeals.

## II

■ Before considering the merits, we address two jurisdictional issues. Although neither was fully briefed by the parties, we must address jurisdictional issues sua sponte. *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996).

### A

Plaintiffs seek to appeal four rulings by the district court: (1) its denial of plaintiffs' motion for a preliminary injunction; (2) its denial of plaintiffs' motion for summary judgment; (3) its partial grant of defendants' motions to dismiss; and (4) its denial of plaintiffs' motion for reconsideration. We conclude that we have jurisdiction to review all but the denial of plaintiffs' motion for summary judgment.

Although we generally possess jurisdiction only over final orders, it is well established that we have jurisdiction to review interlocutory orders expressly denying injunctive relief pursuant to 28 U.S.C. § 1292(a)(1). *Tri–State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1351 (10th Cir.1989). The district court expressly de-

nied injunctive relief in its October 29, 2013, order, and in its order denying reconsideration. We may accordingly review those rulings.

We would not ordinarily have jurisdiction to review the partial grant of defendants' motions to dismiss and denial of plaintiffs' motion for summary judgment, neither of which is a type of interlocutory order covered by § 1292. However, in certain narrow circumstances, we may exercise pendent appellate jurisdiction over rulings that would not otherwise be subject to interlocutory review. *Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1168 (10th Cir.2003). "[T]he exercise of our pendent appellate jurisdiction is *only* appropriate when the otherwise nonappealable decision is inextricably intertwined with the appealable decision, or where review of the nonappealable decision is necessary to ensure meaningful review· of the appealable one." *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d ´1140, 1148 (10th Cir.2011) (quotation omitted). A ruling is "inextricably intertwined" with an appealable issue only if "the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal—that is, when the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well." *United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1114 (10th Cir.1999).

As discussed below, we agree with the district court that plaintiffs are unlikely to prevail on the merits—and are thus not entitled to a preliminary injunction—in part because their claims do not present a valid basis for heightened scrutiny. That holding necessarily resolves plaintiffs' pendent challenge to the partial grant of defendants' motions to dismiss. Because our legal conclusion that heightened scrutiny does not apply is necessary to a determi-nation of the injunction issue and resolves the dismissal issue, the dismissal order is reviewable in this interlocutory appeal. *See Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir.1995) (pendent appellate jurisdiction is appropriate when ruling on legal question resolves appealable issue and necessarily disposes of otherwise nonappealable issue).

The same is not true of the denial of plaintiffs' motion for summary judgment. Our holding as to heightened scrutiny will serve as law of the case upon remand. *See United States v. Rodriguez– Aguirre*, 414 F.3d 1177, 1185 n. 9 (10th Cir.2005). But it does not *necessarily* resolve the summary judgment question. The district court permitted plaintiffs to proceed under rational basis review, concluding that the existing record was insufficient to resolve those claims. And although we hold that plaintiffs are not likely to prevail under rational basis review, *see infra* Part III.E, "a decision as to the likelihood of success is tentative in nature." *Homans v. City of Albuquerque*, 366 F.3d 900, 904 (10th Cir.2004). Accordingly, our disposition of the preliminary injunction issue does not necessarily resolve the plaintiffs' summary judgment motion, nor is review of the latter necessary to ensure meaningful review of the former. Exercising pendent appellate jurisdiction over the plaintiffs' motion for summary judgment would therefore ·be improper. *See United Transp. Union Local 1745*, 178 F.3d at 1114.

**B**

We must also consider whether plaintiffs' claims are now moot. "A case is moot when it is impossible for the court to grant any effectual relief whatever to a prevailing party." *Office of Thrift Supervision v. Overland Park Fin. Corp. (In .re*

*Overland Park Fin. Corp.)*, 236 F.3d 1246, 1254 (10th Cir.2001) (quotation omitted). "The crucial question is whether granting a *present* determination of the issues offered will have some effect in the real world." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1110 (10th Cir.2010) (quotation omitted).

In response to the Kansas Supreme Court's decision in *Gannon*, the Kansas legislature substantially amended the state's school financing system. Pursuant to the Senate Substitute for House Bill 2506, which was signed into law on April 21, 2014, the LOB cap was increased from 31% to 33% of a district's State Financial Aid. The SMSD school board approved a resolution to increase the LOB to 33% for the 2014–15 school year.[4] After briefing in this case was complete, the Kansas Legislature replaced the SDFQPA with the CLASS Act. *See* 34 Kan. Reg. 272, § 4(a) (April 2, 2015). Although the CLASS Act substantially alters the state's school financing system, the funds to which a district is entitled under it "will be based in part on, and be at least equal to, the total state financial support as determined for school year 2014–2015 under the [SDFQPA] prior to its repeal." *Id.*, § 4(b)(3). And the CLASS Act continues to impose a LOB cap, which is now determined by the cap that would have been applicable under the SDFQPA. *Id.* at 274, §§ 12(a), 13(a).

▆▆▆ Despite the changes to Kansas' system of school financing, the core elements challenged by plaintiffs remain. Although the SDFQPA formula has been replaced by block grants for the next two years, those grants are calculated primarily using the now-repealed SDFQPA formula. *Id.* at 272, § 4(b)(3). Perhaps most importantly, the LOB cap remains in place, though it has been slightly increased. *Id.* at 274, §§ 12(a), 13(a). In their response to defendants' motion to supplement the record, plaintiffs argue that the slight increase in the cap is insufficient and that the higher cap continues to burden their constitutional rights. As outlined in our prior opinion in this case, the forms of relief potentially available to the plaintiffs should they prevail, including enjoining the LOB cap, *see Petrella I*, 697 F.3d at 1294–95, remain available. Because a ruling in favor of plaintiffs could provide them effectual relief, the case is not moot. *See Rio Grande Silvery Minnow*, 601 F.3d at 1110.

### III

▆▆▆ We review the denial of a preliminary injunction for abuse of discretion. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir.2013) (en banc), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, ──── U.S. ────, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Dis-*

---

4. Because these events occurred after the district court issued its order in this case, defendants moved to supplement the record with them, arguing that they render the case partially moot. We grant defendants' motion to supplement the record. *See Morganroth & Morganroth v. DeLorean*, 213 F.3d 1301, 1309 (10th Cir.2000), *overruled on other grounds by*

*TW Telecom Holdings, Inc. v. Carolina Internet, Ltd.*, 661 F.3d 495, 496–97 & n. 2 (10th Cir.2011) ("Of course it is proper for a party to provide additional facts when that party has an objectively reasonable, good faith argument that subsequent events have rendered the controversy moot. Indeed, we depend on the parties for such information...").

*trib., LLC,* 562 F.3d 1067, 1070 (10th Cir. 2009) (quotation omitted). To obtain a preliminary injunction, plaintiffs must show: (1) a likelihood of success on the merits; (2) that they will suffer irreparable harm; (3) that the balance of equities tips in their favor; and (4) that the injunction is in the public interest. *Att'y Gen. of Okla. v. Tyson Foods, Inc.,* 565 F.3d 769, 776 (10th Cir.2009).

The district court concluded that plaintiffs were unlikely to succeed on the merits of their claims that the LOB cap: (1) violates their First Amendment rights; (2) burdens their fundamental rights; (3) imposes an unconstitutional condition; and (4) denies them equal protection. Because we agree with the district court that plaintiffs are unlikely to prevail on the merits, we need not address the remaining preliminary injunction factors. *See Soskin v. Reinertson,* 353 F.3d 1242, 1257, 1262 (10th Cir.2004).

### A

Plaintiffs allege that the LOB cap violates their First Amendment rights to free speech, to association, and to petition the government.

### 1

In their primary argument that the LOB cap is unconstitutional, plaintiffs urge a simple syllogism: Education is speech; the LOB cap burdens education; therefore, the LOB cap burdens speech. Each of these premises is seriously flawed, and they do not support the conclusion that plaintiffs ask us to draw.

No court has ever recognized that a limit on public funding of education constitutes a limit on speech. The education-related speech cases upon which plaintiffs rely are far afield. In *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), the Supreme Court held that a state law requiring university faculty to certify that they were not Communists was unconstitutional, because it risked chilling academic freedom to communicate ideas in the classroom. *Id.* at 592, 603–04, 87 S.Ct. 675; *accord Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (plurality opinion). Similarly, in *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), the Supreme Court recognized that teachers have a First Amendment right to associate with whomever they choose outside the classroom, because "[t]eachers and students must always remain free to inquire, to study and to evaluate." *Id.* at 487, 81 S.Ct. 247 (citing *Sweezy,* 354 U.S. at 250, 77 S.Ct. 1203). Each of these cases recognizes that the First Amendment protects speech in the education context. *See also Kleindienst v. Mandel,* 408 U.S. 753, 763–65, 770, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (recognizing First Amendment interest of professors in hearing ideas of a visa applicant, but holding that these interests do not outweigh the plenary power of Congress over immigration); *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (holding state statute requiring students to salute the flag unconstitutional as an invasion of the "sphere of intellect and spirit" underlying the First Amendment).[5] But the LOB cap does not restrict the speech of plaintiffs (or their children in the classroom) in any way; it simply limits the authority of SMSD to raise revenue. None of the foregoing cases suggest that a

---

5. Of course, the First Amendment does not protect *all* student speech. *See Morse v. Frederick,* 551 U.S. 393, 408–10, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (holding that it does not violate the First Amendment for schools to restrict student expression that is reasonably understood as promoting illegal drug use).

state is compelled by the First Amendment to organize its political subdivisions in a manner that maximizes education funding.[6]

Plaintiffs also rely on campaign finance cases to argue that the LOB cap is unconstitutional because it is a direct restraint on education expenditures. *See Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam); *Republican Party. of N.M. v. King*, 741 F.3d 1089 (10th Cir. 2013). The Supreme Court has made clear that campaign finance laws regulate a form of "political expression" that implicate "the broadest protection" under the First Amendment because they involve "[d]iscussion of public issues and debate on the qualifications of candidates [that is] integral to the operation of the system of government established by our Constitution." *Buckley*, 424 U.S. at 14, 96 S.Ct. 612. Plaintiffs advance no authority to support the novel proposition that campaign finance cases involving restrictions on political expression through electoral debate compel the invalidation of laws that do not concern political expression, but merely allocate limited taxation and budget authority to local governments. *See*

*McCutcheon v. FEC*, —— U.S. ——, 134 S.Ct. 1434, 1448, 188 L.Ed.2d 468 (2014) ("As relevant here, the First Amendment safeguards an individual's right to participate in the public debate through political expression.").

Further, the LOB cap does not restrict expenditures by plaintiffs. It limits property tax levies by school districts. Under Kansas law, plaintiffs may donate as much money as they wish to SMSD. *See Bonner Springs Unified Sch. Dist. No. 204 v. Blue Valley Unified Sch. Dist. No. 229*, 32 Kan. App.2d 1104, 95 P.3d 655, 662–63 (2004) (explaining that Kan. Stat. § 72–8210 allows school districts to receive unlimited donations). Local governments can levy sales taxes which they may donate to school districts. *Id.* Johnson County, where SMSD is located, has done so in the past. *Id.* at 658. And SMSD benefactors have donated $3.5 million to the district through the Shawnee Mission Education Foundation alone. Despite plaintiffs' stubborn insistence in mischaracterizing the LOB cap, it does not prevent anyone from contributing their own money. It simply limits the ability of residents to enact property taxes at the school district level that would compel their neighbors to make expenditures. The First Amendment nei-

---

**6.** Many of the other cases cited by plaintiffs in support of their free speech claim do not involve education at all. *See Sorrell v. IMS Health, Inc.*, —— U.S. ——, 131 S.Ct. 2653, 2667, 180 L.Ed.2d 544 (2011) (holding that state law restricting disclosure of pharmacy records violated First Amendment); *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 470, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (holding that prohibition on receipt of honoraria by government employees violates the First Amendment); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 795, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (holding that campaign finance law prohibiting certain corporate donations violated the First Amendment); *Griswold v. Connecticut*, 381 U.S. 479,

482, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (holding that state law forbidding use of contraceptives violates fundamental right to privacy, and referencing in dicta *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) and *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)).

Plaintiffs also claim support from dicta in a dissenting opinion suggesting that *Meyer* and *Pierce* might have been better decided under the First Amendment. *See Troxel v. Granville*, 530 U.S. 57, 95, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (Kennedy, J., dissenting). Regardless of the merits of this theory, dicta in a dissenting opinion does not make plaintiffs likely to succeed on the merits of their claim.

ther recognizes nor protects any such right.

■ In addition to their speech-suppression claims, plaintiffs contend that the LOB cap impermissibly discriminates against their speech because they are wealthy. The First Amendment disfavors suppression of political speech based on the speaker's identity, including their wealth. *See Citizens United v. FEC*, 558 U.S. 310, 350, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). Laws that restrict speech based on a speaker's identity are subject to some form of heightened scrutiny. *See Riddle v. Hickenlooper*, 742 F.3d 922, 927–28 (10th Cir.2014). But the LOB cap does not restrict speech, rendering these cases inapposite. Further, the LOB cap applies equally to all school districts regardless of their relative wealth.

■ Plaintiffs claim that the LOB cap is facially unconstitutional because spending on education is never harmful, and there is thus no legitimate reason to ever restrict education expenditures. *See United States v. Stevens*, 559 U.S. 460, 473, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (stating that a statute is facially unconstitutional under the First Amendment if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep" (quotation omitted)). However, as discussed in Part III.E, *infra*, there are several reasons that a state might seek to limit the taxing and spending authority of local school districts. As the Kansas Supreme Court has repeatedly recognized, the LOB cap maintains a reasonably equitable distribution of education funding throughout the state. *See, e.g., Montoy IV*, 112 P.3d at 934

("[T]he legislation's increase in the LOB cap exacerbates the wealth-based disparities between districts."); *Montoy II*, 2003 WL 22902963, at *33 ("LOBs, as their use has evolved, create wealth-based disparities in per pupil revenues for Kansas schools."). And "[t]he equity with which [education] funds are distributed ... [is a] critical factor[ ] for the legislature to consider in achieving a suitable formula for financing education" as required by the Kansas Constitution. *Montoy III*, 120 P.3d at 310. By restricting the authority of local districts to raise funds, Kansas channels education funding decisions to the state level such that additional money will benefit all Kansans. *See USD 229*, 885 P.2d at 1182 ("Article 6, § 1 places the responsibility of establishing and maintaining a public school system on the State. Kansas school districts have no inherent power of taxation and never have had.").[7] We see nothing irrational in the goal of equity.

**2**

■ Plaintiffs also contend that the LOB cap infringes on their First Amendment association rights because it prevents them from coming together as a community to vote to raise property taxes to fund education at the district level. But we have repeatedly held that there is no First Amendment right to propose a voter initiative. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006) (en banc) ("Although the First Amendment protects political speech incident to an initiative campaign, it does not protect the right to make law, by initiative or otherwise."); *Save Palisade Fruit-*

---

7. In their reply brief, plaintiffs argue that the Kansas legislature granted school districts home rule authority, providing unlimited power to levy taxes. This argument is clearly foreclosed by the Kansas Supreme Court's 2014 *Gannon* decision, which reaffirms that school districts have "the power to assess taxes locally only to the extent that authority is clearly granted by the legislature." 319 P.3d at 1213.

*Lands v. Todd,* 279 F.3d 1204, 1210–11 (10th Cir.2002) ("[T]he right to free speech ... [is] not implicated by the state's creation of an initiative procedure, but only by the state's attempts to regulate speech associated with an initiative procedure."). When states choose to establish initiative procedures, they are free to limit the subject matter of those initiatives as they see fit. *Save Palisade,* 279 F.3d at 1210–11. Kansas specifically granted school district residents the ability to vote on limited LOB taxes, and no more. §§ 72–6433(e), 72–6435. It is not the province of the federal judiciary to second-guess that choice. *See Save Palisade,* 279 F.3d at 1211–12.

Perhaps recognizing the dispositive authority of these cases, plaintiffs suggest that the Supreme Court's recent decision in *Schuette v. Coalition to Defend Affirmative Action,* — U.S. ——, 134 S.Ct. 1623, 188 L.Ed.2d 613 (2014), overturns *Save Palisade* and *Walker.* In *Schuette,* Justice Kennedy's plurality opinion stated that "[t]here is no authority in the Constitution of the United States or in this Court's precedents for the Judiciary to set aside Michigan laws that commit [affirmative action] policy determination[s] to the voters." *Id.* at 1638. But *Schuette* creates neither a new fundamental right for citizens to pursue voter initiatives generally, nor initiatives regarding education specifically. It merely states that the Constitution does not *forbid* states from allowing voter initiatives. Nothing in *Schuette* makes it unconstitutional for Kansas to limit the initiative rights it grants to school districts.

Plaintiffs also rely on *Citizens Against Rent Control,* which referenced the historical practice of "persons sharing common views banding together to achieve a common end." 454 U.S. at 294, 102 S.Ct. 434. But as the district court recognized, that case struck down a statutory limit on campaign contributions to ballot issue committees. *Id.* at 299–300, 102 S.Ct. 434. In contrast, the LOB cap concerns the subject matter of initiatives; it places no restriction on contributions to initiatives. As discussed above, the LOB cap does not obstruct plaintiffs' desire to come together to achieve a common end. They may lobby the Kansas legislature to change school financing policy, an activity in which SMSD itself already engages. They may propose a voter initiative for a city or county government to levy a sales tax that will be transmitted to SMSD. *See Bonner Springs,* 95 P.3d at 662–63. They may collectively donate money to SMSD, or solicit their neighbors to do so. But plaintiffs' associational rights do not require the State of Kansas to grant unlimited taxing authority to the political subdivision in which they reside.

**3**

In a conclusory argument, plaintiffs assert that the LOB cap violates their First Amendment right to petition the government. When issues are not adequately briefed, they are deemed waived. *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1175 (10th Cir. 2002); *see also In re C.W. Mining Co.,* 740 F.3d 548, 564 (10th Cir.2014) ("Arguments raised in a perfunctory manner ... are waived."). Plaintiffs fail to cite a single case supporting their right to petition claim. We accordingly decline to consider it.

**B**

Plaintiffs go on to argue that the LOB cap violates several fundamental liberties. "[A]ll fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States." *Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 847, 112

S.Ct. 2791, 120 L.Ed.2d 674 (1992) (quotation omitted). The doctrine of substantive due process extends protections to fundamental rights "in addition to the specific freedoms protected by the Bill of Rights." *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). To qualify as "fundamental," a right must be "objectively, deeply rooted in this Nation's history and tradition ... and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed." *Id.* at 720–21, 117 S.Ct. 2258 (quotations omitted). When a plaintiff demonstrates that a challenged law burdens a fundamental right, courts apply strict scrutiny in assessing the validity of the law. *Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

Nothing in the history and tradition of the U.S. Constitution indicates that there is a fundamental right to tax one's neighbors without limitation at the local government level to fund education. Public education was virtually nonexistent at the time the Constitution was ratified. *Morse,* 551 U.S. at 411, 127 S.Ct. 2618 (Thomas, J., concurring); *see also Brown,* 347 U.S. at 489–90, 74 S.Ct. 686 (explaining "it is not surprising that there should be so little in the history of the Fourteenth Amendment relating to its intended effect on public education" given that at the time the Fourteenth Amendment was ratified, "[i]n the South, the movement toward free common schools, supported by general taxation, had not yet taken hold" and "in the North ... compulsory school attendance was virtually unknown"). Nevertheless, plaintiffs contend that the LOB cap should be reviewed under strict scrutiny because it violates their fundamental rights to: (1) education; (2) liberty; (3) property; and (4) vote.

1

■ Various cases have addressed the question of whether there is a "fundamental" right to education in constitutional terms. *Kadrmas v. Dickinson Pub. Schs.,* 487 U.S. 450, 458, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988); *Plyler,* 457 U.S at 221, 102 S.Ct. 2382; *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 37, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). In *Rodriguez,* a Texas statute that relied in part on local property taxation to fund education was at issue. 411 U.S. at 9–10, 93 S.Ct. 1278. The Supreme Court concluded that it would not review the statute under heightened scrutiny because state decisions about raising and disbursing state and local tax revenue are matters in which the Court traditionally defers to state legislatures. *Id.* at 40, 93 S.Ct. 1278. "In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause." *Id.* at 41, 93 S.Ct. 1278. We have previously declined to decide important issues of state law regarding educational policy for the same reason. *See Villanueva v. Carere,* 85 F.3d 481, 487 (10th Cir.1996) ("[C]ourts pay particular deference to states in decisions involving the most persistent and difficult questions of educational policy because our lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels." (quotations omitted)).

As in *Rodriguez,* we are loathe to disturb a matter better left to the states, and we discern "no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved." 411 U.S. at 37, 93 S.Ct. 1278. Plaintiffs allege that their district is

underfunded compared to other districts. But these relative differences in spending levels are, even after passage of the CLASS Act, *see* 34 Kan. Reg. 272, § 4(b)(3), based on a formula carefully crafted by the Kansas legislature, under the watchful eye of the Kansas Supreme Court, to ensure that Kansas allocates education funds equitably. *See Montoy V,* 138 P.3d at 764 ("The legislature ... responded to our concerns about the equitable distribution of funding."). Relative differences in spending levels between districts, grounded in the Kansas Constitution's lofty mandate that education be equitably funded, do not subject the LOB cap to heightened scrutiny.

Plaintiffs rely heavily on *Papasan v. Allain,* 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), which built upon the recognition in *Rodriguez* that heightened scrutiny might be appropriate for a school finance scheme that funded some schools so poorly that it constituted a "radical denial of educational opportunity." *Id.* at 284, 106 S.Ct. 2932 (citing *Rodriguez,* 411 U.S. at 44, 93 S.Ct. 1278). To exemplify such a "radical denial," the Court referenced a system in which children were not taught to read or write and did not receive instruction on even the educational basics. *Id.* at 286, 106 S.Ct. 2932. However, the Court concluded that no such claim was presented in that case. *Id.* Similarly, plaintiffs have not claimed the LOB cap creates such a "radical denial of educational opportunity." *Id.* To the contrary, the record shows that SMSD provides one of the best public education programs in Kansas.

The *Papasan* Court also distinguished *Rodriguez* on the ground that the latter "held merely that ... variations [in school funding] that resulted from allowing local control over local property tax funding of the public schools were constitutionally

permissible in that case." 478 U.S. at 287, 106 S.Ct. 2932. By contrast, *Papasan* involved a narrow dispute about whether the state of Mississippi irrationally distributed a particular set of funds flowing from assets granted to the state by the federal government. *Id.* at 289, 106 S.Ct. 2932. This case is far more similar to *Rodriguez* than to *Papasan.* Plaintiffs challenge a key aspect of the state funding system calibrated to balance concerns of equity and local control. Unlike the potentially groundless allocation of funds in *Papasan,* Kansas allocates State Financial Aid to school districts based on a formula, which the parties have stipulated applies equally to all districts. Disparities in the per-pupil funding that SMSD and other districts receive are not based on an irrational choice, but rather on a carefully-calibrated formula that allocates more funding to those students who are costlier to educate. And plaintiffs have expressly waived any challenge to the elements of that formula.

Plaintiffs advance a convoluted argument that neither *Rodriguez* nor *Papasan* applies. Justice White's dissent in *Rodriguez* noted that for a poor school district in San Antonio to raise equal tax revenue to a neighboring, affluent district, it would have to levy a property tax well above Texas' statutory property tax cap. 411 U.S. at 67, 93 S.Ct. 1278 (White, J., dissenting). The majority opinion, in a footnote, responded that the poorer district's tax rate was well below the cap, and that "the constitutionality of that statutory provision is not before us and must await litigation in a case in which it is properly presented." *Id.* at 50 n. 107, 93 S.Ct. 1278. It cited *Hargrave v. Kirk,* 313 F.Supp. 944, 946 (M.D.Fla.1970), *vacated on other grounds sub nom. Askew v. Hargrave,* 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971) (per curiam), which involved a Florida law that limited the quantity of state funding that counties levying local proper-

ty taxes above a certain amount could receive. The district court invalidated the law because the limit was based on the amount of property in the county, not the county's educational needs.[8] Based on this exchange, plaintiffs argue that *Rodriguez* left open the question of whether a cap on local tax revenue is constitutional. Regardless of whether *Rodriguez* left open the possibility that a tax cap might be unconstitutional under some theory, there is nothing in *Rodriguez* that disturbs the remainder of the Supreme Court jurisprudence on point.

Plaintiffs further attempt to distinguish *Rodriguez* by claiming that they are intentionally discriminated against on the basis of their wealth. This argument is also foreclosed by *Rodriguez*, which held that a school district's relative wealth is not grounds for heightened scrutiny. 411 U.S. at 27–28, 93 S.Ct. 1278; *see also Kadrmas*, 487 U.S. at 458, 108 S.Ct. 2481 ("We have previously rejected the suggestion that statutes having different effects on the wealthy and the poor should on that account alone be subjected to strict equal protection scrutiny.").

**2**

In their second fundamental rights challenge, plaintiffs argue that the LOB cap undermines their right to direct the education of their children. They cite a litany of cases recognizing the fundamental right of parents to make decisions about the care, custody, and education of their children. *See Troxel*, 530 U.S. at 65, 120 S.Ct. 2054 (interference with parental custody choices allowed only to prevent harm to child); *Wisconsin v. Yoder*, 406 U.S. 205, 234, 92 S.Ct. 1526, 32 L.Ed.2d 15

(1972) (states cannot compel parents to keep children in school after age 16); *Stanley v. Illinois*, 405 U.S. 645, 658, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (hearing required to terminate parental rights); *Pierce*, 268 U.S. at 530, 535, 45 S.Ct. 571 (states cannot mandate public education); *Meyer*, 262 U.S. at 397, 403, 43 S.Ct. 625 (states cannot ban the teaching of foreign languages).

But none of these cases recognize a fundamental liberty interest in setting policy for public education funding. All focus on the content of education or school attendance. Further, we have previously held that "parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist.*, 135 F.3d 694, 699 (10th Cir.1998). The LOB cap only prevents plaintiffs from compelling their neighbors to vote on an education-related tax increase at the district level. This is not a fundamental right the Supreme Court has previously recognized, and such recognition is foreclosed by *Swanson*'s admonition that parents lack constitutional rights to control "each and every aspect of their children's education." *Id.*

In their reply brief, plaintiffs claim that our decision in *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir.), *cert. denied*, —— U.S. ——, 135 S.Ct. 265, 190 L.Ed.2d 138 (2014), expands the fundamental liberty interest in childrearing. They emphasize a quote referencing a "cluster of constitutionally protected choices" that includes childrearing and some educational decisions. *Id.* at 1210 (quoting *Carey v. Population Servs. Int'l*, 431 U.S. 678, 684–85, 97

---

8. *Hargrave*, a vacated district court decision from another circuit, is at best potentially persuasive authority. As discussed in Part III.E, *infra*, we are not persuaded that plaintiffs are likely to succeed on the merits of their claim that the LOB cap lacks a rational basis, the rationale for striking the tax cap at issue in *Hargrave*. 313 F.Supp. at 948.

S.Ct. 2010, 52 L.Ed.2d 675 (1977)). But *Kitchen* does not expand the universe of fundamental rights; it merely recognizes that an established fundamental right, the right to marry, extends to same-sex couples. *Id.* at 1199. And it certainly does not create a fundamental right to force one's neighbors to pay taxes related to education. Neither *Kitchen* nor any of the Supreme Court cases plaintiffs cite suggest that the LOB cap is subject to heightened scrutiny based on plaintiffs' liberty interests in raising their children.

**3**

■ Plaintiffs also contend that the LOB cap violates their fundamental property right to spend their own money as they wish. They cite Justice Stevens' concurrence in *Moore v. City of East Cleveland,* 431 U.S. 494, 513–20, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (Stevens, J., concurring in the judgment), in which he concluded that a law placing occupancy limits on private dwellings interfered with a homeowner's choice to use her property as she saw fit. However, Justice Stevens would have invalidated the law at issue on the basis that it "cuts so deeply into a fundamental right normally associated with the ownership of residential property[,] that of an owner to decide who may reside on his or her property." *Id.* at 520, 97 S.Ct. 1932. This can hardly be described as creating a fundamental right to spend one's money as one wishes. Even assuming *arguendo* that *Moore* creates such a right, the LOB cap, as explained above, does not prevent plaintiffs from spending their own money on education. *See Bonner Springs,* 95 P.3d at 662–63 (discussing Kan. Stat. § 72–8210, which allows donations to school districts).

Plaintiffs argue that other Kansas laws would penalize a district that accepts donations and that this penalty violates the First Amendment. *See Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,* —— U.S. ——, 131 S.Ct. 2806, 2822, 180 L.Ed.2d 664 (2011). But *Arizona Free Enterprise* is a campaign finance case which held unconstitutional "a subsidy given in direct response to the political speech of another, to allow the recipient to counter that speech." *Id.* In the case at bar, no such speech, counterspeech, or subsidy is at issue. Further, § 72–8210 is explicit that donations to school districts, if placed in a separate fund, "shall be exempt from budget law requirements and shall be used in compliance with the wishes of the donor as nearly as may be." *Id.* Plaintiffs do not cite any Kansas law to the contrary, indicating that the LOB cap would penalize districts for accepting donations.

**4**

■ The right to vote is fundamental. *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (citing *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). Plaintiffs argue that the LOB cap burdens their fundamental voting rights based on *Kramer v. Union Free School District Number 15,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). In that case, the Supreme Court applied heightened scrutiny to a New York law that forbade some residents from voting in school board elections and on school budget issues. *Id.* at 622, 89 S.Ct. 1886. But *Kramer* only subjects restrictions on *who* may vote to heightened scrutiny; it does not demand heightened scrutiny for limitations on *what* topics may be the subject of initiatives.

As we have previously recognized, this is a critical distinction. In *Save Palisade,* we considered a challenge to a Colorado law allowing citizens in home rule counties, but not statutory counties, the power of initiative. *See* 279 F.3d at 1207–08. We held

that the law was not subject to heightened scrutiny because it did not dilute or debase the votes of any group. *Id.* at 1212–13 (discussing *Hellebust v. Brownback,* 42 F.3d 1331, 1333 (10th Cir.1994)). "[A]lleging a violation of free speech or voting rights does not transform what is essentially an initiative case into a voting rights case, and thereby trigger strict scrutiny." *Id.* at 1211 n. 4. The LOB cap functions like the Colorado law in *Save Palisade,* not like the New York law in *Kramer.* It does not forbid the voters in SMSD from voting on statewide education issues, nor does it dilute their votes relative to those of others. Instead, as in *Save Palisade,* it simply limits the ability of local voters to make law directly. *See id.* at 1210–11 ("[N]othing in the language of the Constitution commands direct democracy, and we are aware of no authority supporting this argument.").

Similarly, in *Walker,* we explained that a Utah law requiring supermajority approval of initiatives involving wildlife issues was not subject to strict scrutiny because it involved the process through which laws are enacted, not the communicative conduct of people who support a political position. 450 F.3d at 1099–1100. The LOB cap similarly governs the process through which a tax increase can be voted on; it does not restrict political speech about the merits of such an increase.

Additionally, Plaintiffs argue that the LOB cap is unconstitutional because it impermissibly restricts voting based on economic status. *See Anderson v. Celebrezze,* 460 U.S. 780, 793, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). But again, the LOB cap does not discriminate on the basis of

wealth. As the parties stipulated, it applies to all districts equally.[9]

## C

 In a related argument, plaintiffs contend that the LOB cap places an unconstitutional condition on their fundamental right to education and to vote, and imply that it also places an unconstitutional condition on their First Amendment rights. The unconstitutional conditions doctrine forbids the government from denying or terminating a benefit because the beneficiary has engaged in constitutionally protected activity. *See Koontz v. St. Johns River Water Mgmt. Dist.,* —— U.S. ——, 133 S.Ct. 2586, 2594, 186 L.Ed.2d 697 (2013). It "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Id.*

 The doctrine only applies if the government places a condition on the exercise of a constitutionally protected right. *See Reedy v. Werholtz,* 660 F.3d 1270, 1277 (10th Cir.2011) ("[I]f no constitutional rights have been jeopardized, no claim for unconstitutional conditions can be sustained."). Because the plaintiffs have not demonstrated that they are likely to succeed on the merits of their claims that the LOB cap infringes any of their constitutional rights, they are also unlikely to succeed on the merits of an argument premised on the existence of such rights.

Even if plaintiffs' claimed rights were recognized, their unconstitutional conditions arguments are unavailing. Plaintiffs rely on *Meyer v. Grant,* 486 U.S. 414, 108

---

9. Even if plaintiffs were correct that the LOB cap implicates a fundamental right, "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." *Regan v. Taxation with Representation of Wash.,* 461 U.S. 540, 549, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). The LOB cap cannot be said to abridge any fundamental right because it does not forbid any activity, but rather limits the extent of a subsidy funded through local taxes.

S.Ct. 1886, 100 L.Ed.2d 425 (1988), which overturned a Colorado law that criminalized paying petition circulators. *Id.* at 415–16, 108 S.Ct. 1886. The Court rejected the state's argument that because it had no obligation to afford its citizenry the option of initiatives, it could impose unlimited conditions on their use. *Id.* at 420, 108 S.Ct. 1886. It agreed with our conclusion that regardless of whether the initiative process is optional, states must run such elections "in a manner consistent with the Constitution." *Id.* As we recognized in *Save Palisade,* however, *Meyer* is a case dealing with "the state's attempts to regulate speech associated with an initiative procedure," not limits on the initiative process itself. 279 F.3d at 1211. That the Kansas legislature has granted limited initiative rights to raise school funding taxes up to a certain level does not mean that Kansas must allow initiatives to increase school-funding taxes beyond that level. Plaintiffs have not shown that any constitutional right has been impermissibly conditioned.

**D**

▉ In addition to their fundamental rights arguments, plaintiffs argue that the LOB cap should be reviewed under heightened scrutiny because it denies them equal protection of the law based on a bare desire to harm them. They claim that, as residents of a relatively wealthy school district, they are part of a "politically unpopular group." *See United States v. Windsor,* — U.S. ——, 133 S.Ct. 2675, 2693, 186 L.Ed.2d 808 (2013); *see also Romer v. Evans,* 517 U.S. 620, 633, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). But *Rodriguez* clearly held that wealth, or resi-

dence in a wealthy district, is not a suspect class that requires review under heightened scrutiny. *See* 411 U.S. at 18–28, 93 S.Ct. 1278. And it strains credulity to assert that residents of wealthy communities are subject to the systematic ostracization faced by the gay people in *Windsor* and *Romer. See Windsor,* 133 S.Ct. at 2693; *Romer,* 517 U.S. at 634–35, 116 S.Ct. 1620.[10]

**E**

▉ In the alternative, plaintiffs claim that they are likely to succeed on the merits because the LOB cap cannot survive rational basis review. Under such review, a state statute "must be upheld ... if there is any reasonably conceivable state of facts that could provide a rational basis for" it. *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). "[T]his court will uphold a government classification if it is rationally related to a legitimate government purpose or end." *Teigen v. Renfrow,* 511 F.3d 1072, 1083 (10th Cir.2007) (quotations omitted). Because a classification subject to rational basis review "is presumed constitutional, the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Armour v. City of Indianapolis,* — U.S. ——, 132 S.Ct. 2073, 2080–81, 182 L.Ed.2d 998 (2012) (quotation omitted).

The district court concluded, and defendants and intervenors now argue, that the Kansas legislature enacted the LOB cap to promote equity in education funding. This is obviously a legitimate government interest. The Supreme Court has explained that "the opportunity of an education ...

---

10. Alternatively, we deem this argument forfeited. Although plaintiffs raised it before the district court and in their reply brief, it was never raised in their opening brief. *United*

*States v. Benoit,* 713 F.3d 1, 12 n. 2 (10th Cir.2013) ("Arguments not raised in the opening brief are waived." (quotation and alteration omitted)).

where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown,* 347 U.S. at 493, 74 S.Ct. 686. And as the district court astutely observed, "the pursuit of a claim under the Equal Protection Clause based on the argument that equity is not a legitimate governmental interest seems inherently unsupportable." *Petrella II,* 980 F.Supp.2d at 1308.

Moreover, the Kansas Constitution requires equity in education funding. *Gannon,* 319 P.3d at 1238–39 (discussing Kan. Const. Art. 6 § 6(b)). The Kansas Supreme Court has repeatedly recognized that equity in the education funding arena is not only a legitimate but also a requisite government interest. *See, e.g., Montoy III,* 120 P.3d at 310 ("[T]he equity with which [education] funds are distributed ... [is a] critical factor[ ] for the legislature to consider in achieving a suitable formula for financing education."). In *Gannon,* the Kansas Supreme Court reaffirmed the need to cap the LOB because, absent a cap, the LOB exacerbates inequities by allowing wealthier districts to generate more revenue at the local level than poorer districts exerting the same tax effort. 319 P.3d at 1238–39.

Plaintiffs suggest that SMSD receives an inequitable level of funding. But, as noted above, they expressly waived any challenge to the components of the formula under which total State Financial Aid is calculated. And the Kansas Supreme Court has upheld the need-based aspects of the state's financing system. *See Montoy V,* 138 P.3d at 764 ("Equity does not require the legislature to provide equal funding for each student or school district.... What is required is an equitable and fair distribution of the funding to provide an opportunity for every student to obtain a suitable education."). Promoting equity by allocating resources according to

the differential cost of educating different students is clearly rational.

Even if equity is a rational goal, plaintiffs contend that capping the amount of money districts may raise and spend at the local level is not a legitimate means to achieve that goal. But plaintiffs, narrowly focusing on the interests of SMSD alone, fail to recognize that districts compete with one another for educational resources, like high-quality teachers. By limiting the ability of individual districts to outspend their neighbors, Kansas rationally promotes an equitable distribution of resources throughout the state and seeks to prevent an inter-district arms race from raising the cost of education statewide. Further, by limiting local authority, Kansas channels the efforts of those seeking increased education spending for their own children towards the state level, where such efforts can benefit a broader class of students.

The plaintiffs, or even judges on this court, may well have chosen a different means of equitably funding education in Kansas. But rational basis review does not require that the means chosen by a state be the best available. *See Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Plaintiffs have failed to show that capping the amount of revenue a district may raise is an illegitimate means of achieving the goal of equity. Accordingly, they have not demonstrated that they are likely to succeed on the merits of their rational basis argument.

**IV**

We review a district court's grant of a motion to dismiss de novo. *Albers v. Bd. of Cnty. Comm'rs,* 771 F.3d 697, 701 (10th Cir.2014). In doing so, we accept all well-pled facts alleged in the complaint as true, and draw all reasonable

inferences from those facts in favor of the plaintiff. *Tal v. Hogan,* 453 F.3d 1244, 1252 (10th Cir.2006). To survive a motion to dismiss, a complaint must allege facts sufficient to make a claim for relief facially plausible. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). If an issue of law precludes relief, dismissal is appropriate. *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

The district dismissed plaintiffs' various claims that the LOB cap should be reviewed under heightened scrutiny. It allowed plaintiffs' claims that the LOB cap violated their equal protection rights to proceed further on rational basis review.[11] As discussed above, plaintiffs are unlikely to succeed on the merits of their claims because, as a matter of law, the LOB cap is not subject to heightened scrutiny. We accordingly affirm the grant of defendants' motion to dismiss as to plaintiff's claims that the LOB cap should be reviewed under heightened scrutiny.

## V

Plaintiffs make much of the laboratory of democracy concept. But they fundamentally misapprehend its meaning. In *New State Ice Co. v. Liebmann,* 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747 (1932), Justice Brandeis explained that within our federalist system, states are laboratories of democracy. *See id.* at 311, 52 S.Ct. 371 (Brandeis, J., dissenting). This metaphor may also aptly describe the relationship between state and local governments. *See, e.g.,* Heather K. Gerken, *Foreword: Federalism All the Way Down,* 124 Harv. L.Rev. 4, 23–24 (2010). But this case asks if the U.S. Constitution precludes a state from choosing its preferred statutory re-

gime, not whether Kansas has allowed its local governments adequate room for experimentation.

Kansas' school funding system exemplifies how states can serve as laboratories of democracy. Citizens in many states no doubt desire an educational system that is both equitable and adequate. The people of Kansas desired such a system so strongly that they amended their Constitution to require it. Through decades of litigation and frank communication between the state's three branches of government, Kansas created a system that seeks to equitably distribute resources throughout the state, and does not make "the quality of a child's education a function of his or her parent's or neighbors' wealth." *Montoy V,* 138 P.3d at 769 (Rosen, J., concurring). Not every state would choose to alleviate inequity by limiting local authority to tax and spend. Kansas' solution might not be the best one. But it is manifestly not the province of a federal court to manufacture from whole cloth a novel set of rights that would upend a carefully crafted and comprehensive state funding scheme.

We **DISMISS** plaintiffs' challenge to the district court's denial of summary judgment. We otherwise **AFFIRM** and **REMAND** for further proceedings. Defendants' motion to supplement the record is **GRANTED.**

---

11. The defendants have not cross-appealed the partial denial of their motion to dismiss, and thus we have no occasion to rule on the aspects of plaintiffs' claim that the district court has permitted to proceed.